*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*




# OPINION

No. 04-11-00567-CR

Neptali Armando **ORELLANA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 399th Judicial District Court, Bexar County, Texas
Trial Court No. 2009CR10396
Honorable Juanita A. Vasquez-Gardner, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:    Sandee Bryan Marion, Justice
Rebecca Simmons, Justice
Marialyn Barnard, Justice

Delivered and Filed:  August 15, 2012

AFFIRMED

After a jury trial, appellant Neptali Armando Orellana was found guilty of murder.  The trial court assessed punishment at forty-five years confinement in the Texas Department of Criminal Justice–Institutional Division.  On appeal, Orellana raises three issues, complaining the trial court erred in: (1) denying his motion for directed verdict; (2) denying his motion for mistrial when the State asked an improper, burden-shifting question; and (3) failing to provide him with a separate Spanish language interpreter.  We affirm the trial court's judgment.

**BACKGROUND**

On the morning of June 20, 2009, several men gathered at the home of Arturo Vallejo ("Ché"). It was common for men to gather at Ché's home to talk and drink alcohol. Around nine that morning, Ché woke up and found people already gathering on his property. The men were standing near a parked RV that belonged to Jesus Ponce ("Chuy"). Chuy, who was a long-time friend of Ché, lived in the RV.

Several men were there that morning, including Chuy, Ricardo Rodriguez ("Ronco"), Ignacio Benavides ("Nacho"), Juan Jimenez Santana ("Indio"), Javier Tovar ("Pollo"), and appellant Orellana ("Wero," "the Honduran," or "Honduras"). Ché came outside and gave Chuy some food. Ché then went back inside. The evidence showed that some of the men were drinking, using drugs, or both. Some men were more intoxicated than others. Eventually an argument erupted when Orellana seemed to criticize the way Pollo was cleaning Ronco's boots. Though the testimony varied somewhat, it seems Orellana told Pollo he was not cleaning the boots properly, and that in Honduras they had an instrument that would do it better. Pollo became angry and left without completing the cleaning. Ronco then told Orellana he would have to finish cleaning his boots because he caused Pollo to leave before the boots were clean. When Orellana refused, he and Ronco began to argue. Indio and Nacho took Ronco's side; however, Chuy interceded on Orellana's behalf and verbally stopped Ronco from hitting Orellana.

Apparently, Orellana was not happy that Chuy was defending him, telling Chuy to "shut up" and "mind his own business." Having heard the men arguing, Ché came outside and asked Ronco, Nacho, and Indio to leave. Ché went back inside, but the men did not leave and they continued to argue with Orellana. Ché came back outside and told Ronco, Nacho, and Indio they had five minutes to leave. The three men left and went to the home of a neighbor, Ernesto

Esquivel. Esquivel lived two houses from Ché. Inside Esquivel's home, the men continued to drink. Orellana and Chuy were left alone on Ché's property.

Ché and his son-in-law were sharing a bottle of wine on Ché's porch, which was on the side of the house. From where they were sitting, they could not see the area of the property where the men had been drinking and arguing. Ché testified that not long after the three men left, leaving Orellana and Chuy alone, he saw Orellana leave in his green Toyota. Ché stated he found it unusual that Orellana left so abruptly, without saying good-bye. Ché said Orellana usually said good-bye before he left.

Approximately two hours after Ché saw Orellana leave, Ché's wife and daughter returned from the hospital where they had visited Ché's dying brother. As they walked toward the house, they saw Chuy lying on the ground and yelled for Ché. Ché testified Chuy was lying on the ground. Ché said he "got very scared" and went into the house. Ché told his wife to call the police.

San Antonio Police Officer James Reyna was dispatched to Ché's home. Officer Reyna testified he was the first officer to arrive, although EMS and a San Antonio Fire Department fire engine were already there. When he arrived, he saw "a deceased male" with head trauma, lying in a fetal position covered in blood. The officer then notified his sergeant and the homicide unit and also requested a crime scene investigator and a representative from the medical examiner's office. Officer Reyna stated he then began canvassing for witnesses. After speaking with several witnesses, Officer Reyna determined the victim was Jesus Ponce, also known as Chuy. The officer spoke with Ché, Ché's wife, and the victim's wife, Paula Ponce. Later, Officer Reyna took Ché to police headquarters for questioning by the homicide detectives.

Jesse Salame, a homicide detective with the San Antonio Police Department, investigated Chuy's death. After receiving notification of the incident, Detective Salame went to the scene and spoke with Officer Reyna. Detective Salame tried to find possible witnesses, and spoke to some of the victim's family members who had arrived after learning Chuy was dead. From witnesses, the detective learned there were others a couple of houses away that had been drinking with the victim before he was killed. Detective Salame went to Esquivel's house and spoke to Ronco, Pollo, and Nacho. Initially, the three men were uncooperative, but ultimately they gave statements.

After Detective Salame and several other detectives spoke to Ronco, Pollo, and Nacho, they learned there was another person present with the victim that morning. The three witnesses referred to this person as "Honduras." Unable to locate the person with only the nickname, Detective Salame spoke to Ché, who helped them locate "Honduras." Ché knew where Honduras lived, but did not know the address, so he took detectives to the apartment complex. When the detectives and Ché arrived at the apartment complex, they saw a man look at them through the blinds of an apartment sliding glass door. Ché told officers it was "Honduras."

The person identified as "Honduras" closed the blinds. The detectives knocked on the door of the apartment identified by Ché as belonging to Honduras. After several minutes, Veronica Galaviz, who was Orellana's girlfriend, answered the door. Initially, Galaviz told detectives "Honduras" was not there. Eventually, she let the detectives into the apartment. Detective Salame told her he saw the man they were searching for peering through the blinds when they arrived. She called out and the man identified as "Honduras" came out of the bathroom. At trial, Detective Salame identified the man as Orellana.

Orellana's girlfriend, Galaviz, testified at Orellana's trial as a witness for the State. Galaviz stated that on the day of the murder, she left at about 7:00 a.m. for her job as a phlebotomist at the South Texas Blood and Tissue Center. According to Galaviz, Orellana, who was unemployed, was still asleep. Galaviz said she asked Orellana to put a chicken she had prepared in the oven at 1:00 p.m. so it would be ready when she got home from work. She called him at 11:00 a.m. to remind him about the chicken, and Orellana told her he was at Ché's house. Galaviz said she could tell from his speech that Orellana had been drinking. At approximately 1:00 p.m., she tried to call Orellana again to remind him about the chicken, but he did not answer. Galaviz testified she tried calling him back ten or fifteen minutes later, but he still did not answer.

Galaviz got home between 3:00 p.m. and 4:00 p.m. She said she thought Orellana was home because his vehicle, the green Toyota 4Runner, was parked in front of their apartment. However, when she went inside, he was not there. Approximately five minutes later, Orellana came into the apartment. Orellana told Galaviz he was outside talking on the phone. She noticed Orellana had not turned on the oven to cook the chicken.

Galaviz said Orellana grabbed the trash bag to take it outside. As he did, he received a phone call and told Galaviz he was "going to run an errand and that he would be back later." Galaviz told the jury that Orellana left the apartment, but did not get into his vehicle. Galaviz knew Orellana had been drinking because she could smell the alcohol on his breath. Orellana returned an hour and a half later.

While he was gone, Orellana called Galaviz and asked "[h]ad anybody been by the house." Galaviz thought this was a peculiar question because "[n]obody ever came to our house." Orellana called Galaviz a second time while he was out, about thirty minutes after the

first call. This time he asked if the chicken was cooked, and again asked if anyone had come to the apartment. When Galaviz asked why he wanted to know if anyone came by, Orellana said he received a phone call in which he was told, "[he] got carried away and . . . sent somebody to another planet." Orellana claimed not to know what the phone call was about, and advised Galaviz, "You don't know anything."

When Orellana returned to the apartment, the couple ate dinner. After dinner, Galaviz sat down at the computer. Orellana came into the bedroom and asked Galaviz to look up the location of the nearest Honduran consulate, which was in Houston. He also asked her to check the distance to Little Rock, Arkansas and New York State. Galaviz complied with all of the requests and gave Orellana the information. Orellana then went back into the living room to watch television. However, twice on his way to the bathroom, he went to the sliding glass door and looked outside.

By 8:30 p.m. or 8:45 p.m., Galaviz had gone into the living room to watch television with Orellana. At that time, she heard someone pounding on the apartment door. Orellana told her it was Ché, and instructed her to tell Ché he was not home. Orellana went into the bathroom and closed the door. Initially, Galaviz said she did not know who the men at the door were, and told them Orellana was not home. However, after Galaviz discovered the men were detectives, she let them inside and pointed to the bathroom where Orellana was hiding. When called, Orellana came out of the bathroom. Galaviz said Orellana was "surprised, shocked" when he saw all of the officers.

Galaviz and Orellana gave Detective Salame written consent to search the apartment and they also gave consent to a search of the green Toyota 4Runner.[1] The vehicle was found three buildings away from Orellana's apartment, even though there were empty parking spaces

---

[1] Galaviz testified that the title to the green Toyota 4Runner was in her name, but only Orellana drove it.

directly in front of the apartment. Orellana later claimed he had to park away from the apartment because a truck and trailer were taking up several spaces in front of the apartment. Detective Salame testified that when he opened the door of the vehicle he was struck by how clean it was. There was no dust in the vehicle, it was very clean. The detective stated even the carpet was very clean, no gravel or other debris one would expect from a person entering and exiting. The detective opined that the vehicle had been recently cleaned. However, having previously worked with the evidence unit, Detective Salame testified he looked for places people typically forget to clean. Specifically, he looked at the seat belt strap and the buckle. He testified he saw what he believed to be blood on the seat belt. A photograph of the stain of the seat belt was admitted into evidence. Subsequent DNA testing established there was blood on the seat belt and the blood belonged to the victim.

Orellana was taken to the police station after he agreed to give a statement. Because Orellana spoke only Spanish, he was questioned by Detective Manuel Arthur Nunez. A redacted version of the videotaped interview was admitted into evidence and played for the jury. A transcript of the video was also admitted into evidence.

Orellana admitted he was at Ché's home on the day Chuy was killed. He said he was there drinking beer and hanging out. Orellana first told the detective he left because Ché asked everyone to leave. Orellana claimed he left as soon as Ché asked. However, he later told the detective he left because he had to cook a chicken his girlfriend had asked him to cook. He also changed his story about when he left, stating he left "a little bit after everybody else had left." He did admit, however, that at one point only he and the victim remained at the back of the property. Orellana admitted he argued with some of the men at Ché's home that day, claiming the men did not like him because he was Honduran. Orellana said the men "wanted to beat me

up" because they were crazy and drunk. Orellana agreed with the other witnesses that Chuy intervened in the argument on his behalf, but contrary to other witnesses' statements, he denied any argument or disagreement with Chuy based on the intervention.

Orellana admitted changing his clothes, specifically his shorts, when he got back to his apartment. When asked why he changed, Orellana first said his dog "dirtied his shorts," but later told the detective he urinated on himself. He then told a third story, stating the shorts he was wearing at Ché's "were a little snug" so he changed when he got home. A search of Orellana's apartment did not turn up any shorts soiled in either way described by Orellana.

When specifically asked, Orellana denied knowing Chuy was dead, but admitted he knew something had happened at Ché's because someone called him and told him. When Detective Nunez told Orellana Chuy had been killed on Ché's property, Orellana acted surprised. When Detective Nunez suggested that perhaps Orellana had killed Chuy in self-defense, Orellana adamantly denied it, claiming he was never in a situation with Chuy where he had to defend himself. Orellana denied killing Chuy, claiming Chuy was friendly and never offended anyone.

The detective told Orellana they knew he had made several phone calls after he returned to his apartment, but before police arrived. Orellana explained he called his cousin in New York, asking about a job. However, he later changed the story behind this call, stating it was to look into the possibility of moving to New York. Orellana told the detective he called someone in Corpus Christi to inquire about a job. A third call Orellana could not explain, claiming he had lent his phone to someone, but he could not recall to whom. With regard to lending the phone, Orellana said he lent it to someone on Flores Street, where he claimed to be searching for work. Detective Nunez testified he found the timing of the phone calls "odd," given they were made to places outside San Antonio soon after the murder.

When the detective questioned him about why he was "hiding" in the bathroom when they knocked on the door, Orellana claimed he was not hiding, but had been calling the dog. When the detective confronted him with the fact that he had seen them from the back door and he quickly removed himself, Orellana denied he was afraid, stating there was nothing wrong with him seeing the officers and then going to the back to watch television, which conflicted with his claim that he was calling the dog. When asked why his girlfriend answered the door, Orellana claimed his girlfriend always answered the door because Orellana does not speak English.

During his interview with Detective Nunez, Orellana asked the detective, "Tell me why I would beat up a person who . . . why?" Although the detective had told Orellana the victim was dead, he never told him how he was killed, that he was beaten as opposed to being shot or stabbed.

The Chief Medical Examiner of Bexar County, Dr. Randall Frost, testified Chuy suffered a significant head injury, stating the victim's skull was "basically crushed and fractured into many, many pieces." The fractures were so significant you could see the brain through the fractures. Dr. Frost stated "a lot of force" and "multiple impacts" were involved in creating the fractures. Dr. Frost said the fractures could not have been caused by a simple fall, but were consistent with the victim suffering multiple blows from a blunt force object. Dr. Frost determined the manner of death was homicide.

When the results came back from the swabs taken from the seatbelt of the Toyota 4Runner, they showed the stain discovered by the detectives was the victim's blood. Thereafter, Detective Salame obtained an arrest warrant for Orellana for the murder of Jesus Ponce, who was known as Chuy. Orellana was subsequently tried and convicted of the murder. After sentencing, Orellana perfected this appeal.

## ANALYSIS

On appeal, Orellana complains the trial court erred in: (1) denying his motion for directed verdict; (2) denying his motion for mistrial when the State asked an improper, burden-shifting question; and (3) failing to provide him with his own Spanish language interpreter. We shall discuss each issue in turn.

### *Directed Verdict*

Orellana first contends the trial court erred in failing to grant his motion for directed verdict because the State failed to prove beyond a reasonable doubt that he murdered Chuy. More specifically, Orellana claims that although the State may prove the identity of Chuy's killer by circumstantial evidence, the evidence in this case was not sufficient to establish Orellana was the killer. Orellana argues most of the witnesses were "extremely intoxicated," and the victim took Orellana's side during the trivial argument that preceded the murder, giving Orellana no motive for the murder.

After the State rested, Orellana moved for a directed verdict, which the trial court denied. We treat an appellate issue complaining about the denial of a motion for directed verdict as a challenge to the legal sufficiency of the evidence. *Tovar v. State*, 165 S.W.3d 785, 789 (Tex. App.—San Antonio 2005, no pet.) (citing *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996)). In reviewing a legal sufficiency claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Mayberry v. State*, 351 S.W.3d 507, 509 (Tex. App.—San Antonio 2011, pet. ref'd) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Reviewing the evidence under this standard takes into account the trier of fact's duty "to resolve conflicts in the testimony to weigh the evidence, and to draw reasonable

inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Thus, in analyzing the legal sufficiency of the evidence, this court will determine whether the necessary inferences are reasonable based on the combined force of the evidence when viewed in the light most favorable to the verdict. *Mayberry*, 351 S.W.3d at 509 (citing *Clayton v. State*, 235 S.W.3d 772, 779 (Tex. Crim. App. 2007)). The standard of review is the same for both direct and circumstantial cases. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

Moreover, we must keep in mind that we may not reweigh the evidence or substitute our judgment for that of the jury. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and the jury may accept or reject all or any part of a witness's testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). The jury maintains the power to draw reasonable inferences from basic facts to ultimate facts. *Welch v. State*, 993 S.W.2d 690, 693 (Tex. App.—San Antonio 1999, no pet.). Moreover, it is for the jury to reconcile any evidentiary conflicts. *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995); *Welch*, 993 S.W.2d at 693.

A criminal offense may be proven by circumstantial evidence. *Easley v. State*, 986 S.W.2d 264, 271 (Tex. App.—San Antonio 1998, no pet.) (citing *Jackson*, 443 U.S. at 319). More specifically, the identity of the alleged perpetrator may be proven by circumstantial evidence. *Welch*, 993 S.W.2d at 693. As the Austin Court of Appeals explained in *Roberson v. State*:

> The State may prove its case by circumstantial evidence if it proves all of the elements of the charged offense beyond a reasonable doubt. The sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused. It is important to remember that all the evidence the jury was permitted, properly or improperly, to

consider must be taken into account in determining the sufficiency of the evidence.

16 S.W.3d 156, 164 (Tex. App.—Austin 2000, pet. ref'd) (internal citations omitted).

Orellana argues the State failed to prove he killed Chuy, i.e., the State failed to establish the identity of the killer beyond a reasonable doubt. Orellana asserts there is no direct evidence he committed the murder. Orellana points out that none of the State's witnesses claimed to have seen the murder, and in fact, most of the witnesses were intoxicated at the time of the relevant events, and some of them were using illegal drugs. He also points out no murder weapon was found, and not even the medical examiner could identify the exact weapon or type of weapon used to commit the murder. Orellana concludes that the circumstantial evidence is legally insufficient.

We hold there is sufficient credible evidence to support the jury's finding that Orellana was the person who murdered the victim. There is evidence of an altercation between Orellana and the victim a short time before the murder. There is evidence, though contradicted, that Orellana was alone with the victim and was, in fact, the last person known to be with the victim before the murder. After the murder, Orellana was acting strangely, telling his girlfriend he received a phone call in which he was told, "[he] got carried away and . . . sent somebody to another planet." He asked his girlfriend to search for the closest Honduran consulate and the distance to New York. Orellana admitted to detectives he changed clothes when he got home, but gave three different explanations for why he changed. Orellana parked his vehicle away from the apartment, and when it was searched, the detectives found it extraordinarily clean, without even dirt or gravel in the floorboard that one would expect from entering and exiting. Most importantly, the detectives found what was later determined to be the victim's blood on the seatbelt of Orellana's vehicle.

We hold this evidence, along with that detailed in the background section of this opinion, though circumstantial, was sufficient to allow the jury to find that Orellana was the perpetrator of the offense. Accordingly, we overrule Orellana's challenge to the sufficiency of the evidence.

*Motion for Mistrial*

Orellana next complains that the trial court erred when it denied his motion for mistrial. Specifically, Orellana argues he was entitled to a mistrial because the prosecutor, in a question to a crime scene investigator, "sought to shift the burden of proof" to the defendant. The State counters that even if the question was improper, any error was cured by the trial court's instruction to the jury that the burden of proof is on the State and never shifts to the defense.

During its case-in-chief, the State called a crime scene investigator as a witness. The State questioned the investigator about blood collected from a bag containing a basketball that was found at the crime scene, and the following occurred:

Q [Prosecutor]: Now, do you know if blood testing can be requested by the district attorney's office?

A [Investigator]: I'm not aware.

Q [Prosecutor]: Are you aware that blood testing can be requested by the defense?

[Defense Counsel]: Your Honor, we're going to object. That's shifting the burden of proof. We have no – nothing to prove. That's shifting the burden to the defense. That's –

[Prosecutor]: May I respond?

[Court]: Yes.

[Prosecutor]: Your Honor, I'm not trying to shift the burden at all. I'm just trying to indicate that both the district attorney's office and the defense have equal opportunity to inspect all evidence and test all evidence containing biohazard, blood material, DNA at their request.

[Court]: Okay.

[Defense Counsel]: And Your Honor, Counsel well is aware that the burden of proof lays [sic] strictly with the State. We have – we don't have to do anything. I think, as you indicated yesterday, we could sit here and read the newspaper. We have no burden. They have the burden. They're the ones making the accusation.

[Court]: Okay. They're actually – ladies and gentlemen, they're both right. The defense has the same opportunity to test whatever there might be, but they don't have to. They don't have to do anything because the entire burden of proof rests upon the State to do that.

[Defense Counsel]: Your Honor, we would ask – at this time we would ask for a mistrial.

[Court]: Denied.

Orellana insists a mistrial was necessary because the allegedly burden-shifting question caused incurable prejudice to the defense. Orellana further insists the error was constitutional, requiring an analysis under Rule 44.2(a) of the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 44.2(a) (stating that if record reveals constitutional error that is subject to harmless error review, court of appeals must reverse unless it determines beyond reasonable doubt that error did not contribute to conviction or punishment). We address this second contention first.

The error alleged by Orellana is not based on the trial court's response to his objection, but its failure to grant the motion for mistrial. Whether a failure to grant a motion for mistrial requires a constitutional harm analysis was specifically addressed by the court of criminal appeals in *Archie v. State*. In *Archie*, the court held that a harm analysis is employed only when there is error, and ordinarily, error occurs only when the trial court makes a mistake. 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). If the trial court sustains a defense objection and instructs the jury to disregard, the only adverse ruling, i.e., the only occasion for making a mistake, was the denial of the motion for mistrial. *Id.* Accordingly, the only issue "is whether the refusal to grant the mistrial was an abuse of discretion," and an analysis under Rule 44.2(a) is erroneous. *Id.* at 700.

Although the trial court did not specifically sustain Orellana's objection, from the colloquy, it is clear the trial court agreed with Orellana's position that he bore no burden of proof, that the entire burden was upon the State. Moreover, the trial court sua sponte instructed the jury that Orellana had no burden and the entire burden of proof was on the State. We find it of no moment that the trial court agreed that both the State and the defense are entitled to testing of evidence, because that is beyond dispute. Accordingly, we hold, as the court of criminal appeals did in *Archie*, that an analysis under Rule 44.2(a) is improper. *See id.*

Now, we turn to the question of whether the trial court erred in denying Orellana's motion for mistrial. We hold that it did not. In reviewing a trial court's ruling on a motion for mistrial, we must determine whether the trial court abused its discretion. *Id.* at 699. A trial court abuses its discretion if its decision was outside the zone of reasonable disagreement. *Id.* "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Id.* And although we do not conduct a Rule 44.2(a) analysis, "'whether a mistrial should have been granted involves balancing most, if not all, of the same considerations that attend a harm analysis" under Rule 44.2(a):

- The severity of the misconduct, i.e., the magnitude of the prejudicial effect of the prosecutor's remarks;

- The measures adopted to cure the misconduct, i.e., the efficacy of any cautionary instruction by the judge; and

- The certainty of conviction absent the misconduct, i.e., the strength of the evidence supporting the conviction.

*Id.*; *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (balancing foregoing factors to determine whether improper jury argument warranted mistrial).

In balancing these factors, we first observe that it is generally permissible for the State to comment on a defendant's failure to present favorable evidence, and such comments do not shift

the burden of proof. We find *Jackson v. State* analogous. *See* 17 S.W.3d 664 (Tex. Crim. App. 2000).

In *Jackson*, the appellant argued the State had impermissibly shifted the burden of proof to the defense when it told the jury during closing argument that "the defense would have called its expert to the stand if it had seriously disputed the State's evidence." 17 S.W.3d at 674. The court of criminal appeals held "the challenged comments did not impermissibly shift the burden of proof to the defense, particularly given the prosecutor's repeated reminders to the jury that the defense was not required to present any evidence." *Id.*; *see also, e.g., Pope v. State*, 207 S.W.3d 352, 365 (Tex. Crim. App. 2006) (stating party may always comment on fact that opponent failed to call available witness and argue witness was not called because testimony would be unfavorable); *Bible v. State*, 162 S.W.3d 234, 249 (Tex. Crim. App. 2005) (holding prosecutor's argument that defendant failed to produce evidence he was model prisoner did not impermissibly shift the burden of proof); *Patrick v. State*, 906 S.W.2d 481, 491 (Tex. Crim. App. 1995) (holding argument that points to defendant's failure to produce evidence other than his own testimony is proper); *Torres v. State*, 979 S.W.2d 668, 673-74 (Tex. App.—San Antonio 1998, no pet.) (holding prosecutor could comment on defendant's failure to call defense expert).

Based on the cases cited above, as well as the trial court's instruction, we hold the complained of question was likely not improper, given that the State may comment on a defendant's failure to produce evidence, *see id.*, but even if the question was improper, the magnitude of any prejudicial effect the question might have had on the jury was slight. *See Archie*, 221 S.W.3d at 699.

As to the measures adopted to cure the misconduct and the effectiveness of such measures, the trial court, sua sponte, specifically instructed the jury that although it was true that

both the State and the defense were entitled to test evidence, it was the State that bore the burden of proof, the defense was not required to prove anything. Although the trial court did not specifically instruct the jury to disregard, it did advise the jury on the proper burden of proof, clearing up any potential confusion that might have been caused by the prosecutor's question and the colloquy that followed. And, the jury is presumed to listen to and heed such statements from the court. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (holding court generally presumes jury will follow judge's instructions). Thus, we hold the trial court's statement to the jury was sufficient to cure any harm or prejudice that might have occurred. *See id.* (holding instructions to jury are generally considered sufficient to cure improprieties that occur during trial); *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) ("Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer . . . ."); *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) (holding that in most instances, instruction to disregard remarks will cure any error). Orellana has not cited any authority, nor have we found any, holding the alleged error complained of here is the type that could not be cured, mandating a mistrial. *See Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) ("A mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile.").

Finally, with regard to the last factor, i.e., the strength of the evidence supporting the conviction, when we look at the record as a whole, we hold that although circumstantial, the evidence produced by the State established Orellana's guilt. It is likely Orellana would have been convicted even if the prosecutor had never asked the question at issue. Moreover, the trial court and the State reminded the jury several times throughout the trial, that it was the State who bore the burden to establish Orellana's guilt beyond a reasonable doubt.

A mistrial is reserved for those rare circumstances when the objectionable action was "so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant." *Young v. State*, 137 S.W.3d 65, 77 (Tex. Crim. App. 2004) (quoting *Young v. State*, 73 S.W.3d 482, 485 (Tex. App.—Houston [1st Dist.] 2002)). Because a mistrial is an extreme remedy, it should be granted only when prejudice remains even after less drastic measures, including curative instructions, are used. *Ocon v. State*, 284 S.W.3d 880, 885-86 (Tex. Crim. App. 2009). We hold the error, if any, caused by the prosecutor's question, was not so inflammatory that the trial court's reminder to the jury about the burden of proof could not cure any prejudicial effect. Accordingly, we hold the trial court did not err in denying Orellana's motion for mistrial and overrule this complaint.

### *Failure to Provide Separate Interpreter*

Lastly, Orellana complains the trial court erred when it failed to provide him with his own Spanish language interpreter, separate from the interpreter used to translate the testimony of the Spanish speaking witnesses. Essentially, Orellana contends he was entitled to an interpreter who would sit with him and translate for him at all times, including objections or discussions apart from witness testimony.

"It is well settled that if a defendant cannot hear or does not speak English well enough to understand the trial proceedings or communicate with counsel, fundamental fairness and due process of law require that an interpreter be provided to translate between English and the accused's own language." *Linton v. State*, 275 S.W.3d 493, 500 (Tex. Crim. App. 2009). The right to an interpreter is part of an accused's constitutional right to confrontation and a matter of due process. *Kan v. State*, 4 S.W.3d 38, 41 (Tex. App.—San Antonio 1999, pet. ref'd); *see* U.S. CONST. amends. VI, XIV; TEX. CONST. art. I, § 10. In Texas, the defendant also has a statutory

right to an interpreter. *See* TEX. CODE CRIM. PROC. ANN. art. 38.30(a) (West Supp. 2011) (stating there is right to interpreter upon either party's motion or court's motion if it is determined accused does not understand and speak English).

Whether an accused receives adequate interpretive services is a matter within the trial court's discretion because it depends on "a potpourri of factors." *Linton*, 275 S.W.3d at 500. The trial court's discretion is "wide" and "[t]he question on appeal is not whether the 'best' means of interpretive services were employed, but whether the services that were actually employed were constitutionally adequate such that the defendant could understand and participate in the proceedings." *Id.* Therefore, whether there was an error with regard to the provision of interpretive services is reviewed under an abuse of discretion standard. *Id.* at 502. As we noted above, an abuse of discretion occurs only when a trial court's ruling is outside the zone of reasonable disagreement. *See id.* at 503.

Although Orellana did not file a motion requesting a Spanish language interpreter, and there is no express finding by the trial court on the record that Orellana could not understand or speak English, a Spanish-language interpreter was present at the beginning and throughout the trial. And, during jury selection, the trial court advised the venire the interpreter was there to translate for Orellana. When the State called Ronco as a witness, it informed the court that Ronco was "more comfortable in Spanish" and asked for a second interpreter. The court did not believe a second interpreter was necessary as the current interpreter would translate Ronco's testimony for the benefit of Orellana. Orellana objected, stating he had "the right to have an interpreter at all times." Orellana argued a situation might arise "where there may be a question, an objection, something that may be discussed other than from [Ronco], Mr. Orellana's not going to have the benefit of that being translated." The trial court asked the current interpreter if

there was a second interpreter available. The interpreter advised one was available and the court recessed for lunch, believing the second interpreter would appear at that time.

When proceedings resumed, however, the trial court stated it had been informed by court administration that two interpreters are never provided. The court also noted Orellana's counsel spoke "beautiful Spanish" and had no problems communicating with Orellana. Orellana renewed his objection, urging the court to provide two interpreters.

Orellana admits he has found no authority holding that separate interpreters are required when both a witness and the defendant do not speak English. The State agrees there is no authority requiring separate interpreters, and we have found none.[2] Accordingly, the issue is whether the trial court abused its discretion in deciding the services provided to Orellana by a single interpreter were constitutionally adequate, allowing him to understand and participate in the proceedings. *See Linton*, 275 S.W.3d at 500, 502.

The record establishes the interpreter was present during the entire trial. The interpreter translated for Orellana throughout the trial. Even when she was translating for a witness, this translation inured to Orellana's benefit as it was in Spanish and was the same translation he would have received from his own separate interpreter. We hold that just because the interpreter did not translate exclusively for Orellana when she was translating for a witness did not deprive Orellana of any understanding or participation in the proceedings. *See id.* at 504-05 (holding simultaneous understanding is not required).

In addition, the trial court knew that during the time the interpreter was interpreting for a witness, Orellana's counsel could assist him as well, having noted counsel's fluency in Spanish. Orellana never suggested his counsel was so busy translating that it affected counsel's ability to

---

[2] We do not hold that a separate, exclusive interpreter might never be required. Rather, the necessity of a separate interpreter must be judged on a case by case basis.

participate in the trial, and given that the witnesses spoke Spanish, we cannot see how it would be necessary for counsel to translate to such an extent that it affected his ability to properly defend Orellana. The trial court also protected Orellana's constitutional rights with regard to the interpreter by authorizing Orellana's attorney to alert the court if at any point he felt Orellana needed the interpreter while she was interpreting for a witness. The trial court specifically stated it would halt the proceedings and allow Orellana to use the interpreter or speak to his attorney privately.

Based on the interpreter's presence and availability to Orellana throughout the trial, as well as the actions taken by the trial court to protect Orellana's rights in the absence of separate interpreters, we hold the trial court provided Orellana with constitutionally adequate interpretive services so that he understood and was able to fully participate in the trial. Accordingly, we hold the trial court did not abuse its discretion in failing to require a separate interpreter for Orellana.

However, even if the failure to provide a separate interpreter was constitutionally infirm, there is nothing in the record to establish such error was harmful. The Texas Court of Criminal Appeals has adopted the "reasonably substantial relationship" test to satisfy Fourteenth Amendment due process and Sixth Amendment Confrontation Clause concerns. *Routier v. State*, 112 S.W.3d 554, 576 (Tex. Crim. App. 2003). This test focuses on the effect of the error on the advancement of the defendant's defense. *Adanandus v. State,* 866 S.W.2d 210, 219 (Tex. Crim. App. 1993).

We agree with the State that there is nothing in the record to demonstrate that at any time during the trial there was a matter not translated for Orellana that affected his opportunity to confront witnesses and defend himself. There is nothing in the record to suggest Orellana was unaware of any material matter that occurred during the trial. If Orellana's trial counsel did have

to interpret certain events during the trial, there is nothing in the record to suggest such a diversion affected his ability to advocate for Orellana or properly defend him. *See Abdygapparova v. State*, 243 S.W.3d 191, 202 (Tex. App.—San Antonio 1997, pet. ref'd) (noting that period of time defense counsel had to interpret is factor to consider in determining whether defendant was provided proper interpretive services).

Orellana did not file a motion for new trial claiming he did not understand key portions of the trial and that this denied him the right to confront the witnesses against him or prevented him from assisting in his defense. Orellana does not state what he might have done differently but for the denial of an exclusive interpreter. In fact, even on appeal, Orellana gives but one concrete example of a portion of the proceeding that was not translated for his benefit. He relies upon this to support his claim that he was harmed and his rights were violated because he was not given an interpreter for his exclusive use. The one example given involves a bench conference that took place after Paula Ponce, the victim's widow, was called to testify.

Immediately after the State announced Ponce was its next witness, Orellana's attorney asked to approach the bench. Orellana's attorney advised the court that if the State was calling Ponce to identify the victim, the defense would stipulate that the victim was Jesus Ponce. The State advised the court it had three or four questions for Ponce. Orellana's attorney was concerned because Ponce had not been excluded from the trial under the rule under an apparent agreement that she would only testify as to identity. The State argued this was not the agreement; Orellana's counsel objected to Ponce testifying. The trial court overruled the objection, and called Ponce to the witness stand. The bench conference continued, with the attorneys arguing about the limits of Ponce's testimony and discussing her need for an

interpreter. Thereafter, Ponce testified she was married to the victim, Jesus Ponce, for twenty-six years, and she identified two photographs of him. She was then excused.

First, there is nothing in the record to support Orellana's claim that this bench conference was not interpreted for him–the record shows an interpreter was in the courtroom. Second, this bench conference exchange was immaterial to Orellana's understanding of the proceedings and his ability to present a defense. Even if he was not told what occurred at the bench conference, it was fairly immaterial to the overall case. The bench conference did not require Orellana's input. The bench conference concerned a single subject, the parameters of Ponce's testimony, and her testimony was fairly limited to identification, which is what Orellana's counsel had asked for.

Orellana attempts to avoid his failure to point out the specific deprivations caused by the absence of an exclusive interpreter, other than the immaterial bench conference, by arguing it is impossible to know how the use of a single interpreter affected his ability to defend himself "[b]ecause of the privileged nature of lawyer-client communications." However, Orellana does not explain how the attorney-client privilege precludes him from explaining how a single interpreter affected his interaction with his attorney. If there had been an effect, surely Orellana could have explained it without divulging privileged information, e.g., the attorney was too busy interpreting to explain an objection or a ruling.

We hold, therefore, under the reasonably substantial relationship test, any error in failing to provide Orellana with an exclusive interpreter did not affect the outcome of the trial and thus, was harmless. We overrule Orellana's complaint.

## CONCLUSION

Based on our review of the arguments, the record, and the applicable law, we overrule Orellana's points of error. Accordingly, we affirm the trial court's judgment.

Marialyn Barnard, Justice

Publish