

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-13-00703-CR

Aaron T. **ALVAREZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2010CR12559
Honorable Ron Rangel, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:    Sandee Bryan Marion, Justice
Marialyn Barnard, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed:  October 15, 2014

AFFIRMED AS MODIFIED

A jury found appellant Aaron T. Alvarez guilty of three counts of aggravated sexual assault.  The jury recommended a sentence of seventy-five years and a fine of $10,000.00 on each count.  The trial court sentenced Alvarez in accordance with the jury's recommendation.  On appeal, Alvarez contends: (1) the evidence is legally insufficient to support the conviction[1]; and

---

[1] In his first point of error, Alvarez actually contends the trial court erred in overruling his motion for directed verdict because the evidence is legally insufficient to support his conviction.  However, a challenge to the denial of a motion for directed verdict is treated as a challenge to the legal sufficiency of the evidence and is reviewed under the standard applicable to a legal sufficiency challenge.  *Orellana v. State*, 381 S.W.3d 645, 652 (Tex. App.—San Antonio 2012, pet. ref'd); *Sony v. State*, 307 S.W.3d 348, 353 (Tex. App.—San Antonio 2009, no pet.) (citing *Williams v. State*, 937

(2) the evidence is insufficient to support the assessment of attorney's fees. We affirm the trial court's judgment as modified.

## BACKGROUND

The complainant, D.M., who was twenty-three, signed up with a telephonic social media company. D.M. sought to meet people through the company, explaining her parents were strict while she was growing up, refusing to allow her to go out or date until she was twenty-one. D.M. telephonically created a profile, providing her name, age, description, and personal interests.

To meet people through the company, members listen to profiles and if a member finds a profile interesting, he or she could leave a message for the other member. D.M. was eventually contacted by someone named "Ace." "Ace," who was ultimately determined to be Aaron T. Alvarez, the appellant, described himself in his profile as a tall, twenty-one year-old "rapper" with his own music studio.

D.M. stated she was interested in Alvarez because he was a rapper — someone her parents would not have permitted her to spend time with while she was growing up. She responded to Alvarez's message, advising him she was only looking for friends, nothing else. Alvarez asked D.M. to connect "live" and she accepted.

D.M. and Alvarez talked for several days and exchanged text messages. Ultimately, D.M. agreed to meet with Alvarez. D.M. believed they were going to see Alvarez's music studio. Alvarez picked her up around 2:00 a.m. — D.M. worked in her family's restaurant until 1:30 a.m. — and had to be at work the next morning at 7:00 a.m. When they entered a residential neighborhood, D.M. testified she was not concerned because she knew some people had music studios in their garages or extra rooms in their homes.

---

S.W.2d 479, 482 (Tex. Crim. App. 1996)). Accordingly, we will review Alvarez's complaint as a legal sufficiency challenge. *See id.*

D.M. and Alvarez entered a house, which D.M. described as pitch black. Alvarez used a cigarette lighter to illuminate the house. Ultimately, they entered a room at the back of the house and Alvarez turned on the light, which was a red light bulb on the ceiling. D.M. said the room was a "[d]irty, nasty bedroom" that bore no resemblance to a music studio. D.M. asked Alvarez to take her home, but he refused, telling her she was not leaving and was never going home again. Alvarez took the doors off the closet, placing them in front of the bedroom door. D.M. testified that from the moment he told her she was never going home again she was afraid. D.M., who is five feet, one inch tall, said she knew she could not fight Alvarez because he was so much bigger than she — Alvarez is approximately six feet, four inches tall, weighing around 260 pounds.

According to D.M.'s testimony, Alvarez told her to sit on the bed — she had been sitting in a chair. She refused, but Alvarez "started to get angry" so she "got up and sat on the bed." He then told her to take off her pants. When she refused, Alvarez removed her pants and threw them toward the wall. Alvarez told D.M. to remove her underwear. She again refused and Alvarez pushed her back and removed them. Alvarez then turned off the light. According to D.M., Alvarez pushed her back onto the bed and told her to lie on her stomach. D.M. complied, stating that she felt she had no choice because she "didn't want to get hit . . . didn't want to get slapped . . . didn't want to get my hair pulled."

D.M. testified Alvarez got on top of her and rubbed lotion on his penis. He then sodomized her. She told him "no" and pulled away, but he pulled her back toward him. D.M. testified he put his penis inside her rectum, her vagina, and her mouth. D.M. said she told Alvarez she never had anal sex and did not want to, but he persisted. During the course of the night, Alvarez assaulted D.M. vaginally, anally, and orally.

D.M. told the jury Alvarez threatened her, claiming he had a "bazooka," which she said was a gun. According to D.M., Alvarez told her the gun was in a shoe box by the bed. She said

she feared for her life. Alvarez also told her his aunt and uncle were in the next room and his "little cousin" was in the back room of the house. He told her that if she screamed, his uncle would come out and kill her. D.M. said this scared her as well. She testified she stopped talking at this point, thinking "I'm going to die. . . . I'm not going to walk out of that house."

Eventually, the sexual assault stopped and Alvarez said he needed to rest so he stretched out on the bed next to D.M. and fell asleep. She said she never closed her eyes. D.M. stated she tried to leave the bedroom, but could not move the closet doors from the front of the bedroom door. Then, she heard Alvarez waking up and went back to the bed. D.M. testified she started to panic and began throwing up. D.M. told Alvarez she was having chest pains as well and told him to call 911. D.M. also told him she thought she was going to die. D.M. stated this was a ruse to get out of the house. Apparently panicked, Alvarez took D.M. outside, through the garage, and called 911. D.M. admitted she spoke to a 911 operator, but said she could not advise the operator about what was really happening because Alvarez was next to her. So, D.M. told the operator she was having chest pains and throwing up.

Before EMS arrived, Alvarez went back into his house, leaving D.M. alone outside. When she was alone with the EMTs, she told them she was not having chest pains, but had been "raped all night." One of the EMTs called police, who arrived shortly thereafter. D.M. then told the police what happened to her. D.M. was taken to a hospital for a sexual assault exam.

The exam, which was extensive, took several hours. D.M. was anxious and crying. She complained of being in a lot of pain, specifically from her rectum. The examination established trauma to D.M.'s mouth, vagina, and rectum. D.M. told the sexual assault nurse examiner that Alvarez ejaculated only into her rectum. The physical exam showed skin missing from the anal area as well as linear tears. DNA evidence was collected from both D.M. and Alvarez.

At the hospital, D.M. identified Alvarez as her attacker. Police searched Alvarez's home, but never found a gun. Alvarez was also subjected to an examination by a sexual assault nurse who took swabs from his hands, fingernail scrapings, a saliva sample, and a penile swab.

A forensic scientist with the Bexar County Crime Lab created DNA profiles for D.M. and Alvarez. The scientist testified the penile swab tested positive for saliva and that the chance that the saliva belonged to anyone other than D.M. was infinitesimally small. The scientist also found semen, but not sperm, in a sample taken from D.M., but there was not sufficient material for a DNA comparison. There was, however, sufficient material on D.M.'s underwear for a comparison, but Alvarez was excluded as a donor of that semen.

After the reading of the charge and arguments from counsel, the jury retired to deliberate. Thereafter, the jury found Alvarez guilty on all three counts of aggravated sexual assault as alleged in the indictment. After sentencing, Alvarez perfected this appeal.

## ANALYSIS

As noted above, in this appeal Alvarez raises two points of error. He first contends the evidence is legally insufficient to support the conviction for aggravated sexual assault. More specifically, he complains about the aggravating factor, arguing there is no evidence to establish D.M. was in fear that Alvarez would inflict serious bodily injury on her person. He also contends the evidence is insufficient to support the assessment of attorney's fees.

### *Sufficiency of the Evidence — Conviction*

We review a legal sufficiency challenge under the standard announced by the Supreme Court in *Jackson v. Virginia. Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Mayberry v. State*, 351 S.W.3d 507, 509 (Tex. App.—San Antonio 2011, pet. ref'd). Under this standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." *Orellana*, 381 S.W.3d at 652 (quoting *Mayberry*, 351 S.W.3d at 509); *see Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899.

When reviewing the sufficiency of the evidence, we must defer to the jury's weighing of the evidence, resolution of conflicts in the testimony, and assessment of credibility. *Brooks*, 323 S.W.3d at 899; *Orellana*, 381 S.W.3d at 653 (citing *Jackson*, 443 U.S. at 319). We must resolve any inconsistencies in favor of the verdict. *Gonzales v. State*, 330 S.W.3d 691, 694 (Tex. App.—San Antonio 2010, no pet.) (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)). We must also remain mindful that we cannot reweigh the evidence or substitute our judgment for that of the jury. *Orellana*, 381 S.W.3d at 653 (citing *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000)). The jury is the exclusive judge of the credibility of witnesses and the weight to be given to their testimony, and the jury may accept or reject all or any portion of a witness's testimony. *Orellana*, 381 S.W.3d at 653 (citing *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008)). The jury maintains the power to draw reasonable inferences from basic facts to ultimate facts; and their sole province is to reconcile any evidentiary conflicts. *Orellana*, 381 S.W.3d at 653 (citing *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995); *Welch v. State*, 993 S.W.2d 690, 693 (Tex. App.—San Antonio 1999, no pet.)).

Alvarez was charged in a three count indictment with the felony offense of aggravated sexual assault. To convict Alvarez of aggravated sexual assault as charged in this case, the State had to prove beyond a reasonable doubt that: (1) Alvarez intentionally or knowingly caused the penetration of D.M.'s anus or vagina by any means, or caused his penis to contact or penetrate D.M.'s mouth, without D.M.'s consent; and (2) by acts or words Alvarez placed D.M. in imminent fear of serious bodily injury. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(i), (ii), (a)(2)(A)(ii) (West Supp. 2014). As previously stated, Alvarez does not contest the evidence to establish the

sexual assault, but contends the evidence is insufficient to establish D.M. was in imminent fear of serious bodily injury. We disagree.

D.M. testified she complied with Alvarez's request to lie on her stomach while he assaulted her because she "didn't want to get hit. . . . didn't want to get slapped. . . . didn't want to get my hair pulled." This testimony suggests that at some point Alvarez threatened to hit, slap, or pull D.M.'s hair. Additionally, one of the police officers testified Alvarez was approximately six feet, four inches tall and weighed as much as 260 pounds. According to the evidence, D.M. was barely over five feet tall. As stated in the standard of review, the jury maintains the power to draw reasonable inferences from basic facts to ultimate facts. *Orellana*, 381 S.W.3d at 653. It was not unreasonable for the jury to infer from D.M.'s testimony regarding her fear of being hit and slapped, particularly given the size difference between Alvarez and D.M., that Alvarez threatened her with these actions and that the threats placed her in imminent fear of serious bodily injury.

Moreover, D.M. specifically testified Alvarez told her he had a bazooka in a box in the room where he assaulted her. D.M. stated this meant to her that Alvarez had a gun. She said she feared for her life. Alvarez also told her that if she screamed, his uncle would come out and kill her. D.M. said this scared her as well. She testified she stopped talking at this point, thinking "I'm going to die. . . . I'm not going to walk out of that house." This evidence was clearly sufficient to permit the jury to find that by acts or words Alvarez placed D.M. in imminent fear of serious bodily injury. *See* TEX. PENAL CODE ANN. § 22.021(a)(2)(A)(ii).

Alvarez argues D.M. could not have been placed in imminent fear of serious bodily injury with regard to Alvarez's claims about the gun. Alvarez points out no gun was ever found and if there had been a gun in the box as Alvarez allegedly claimed, he would have had to get off the bed "and rummage through the items on top of the box" to get the gun. We find this irrelevant. D.M. testified Alvarez told her he had a gun, and surely the jury could have inferred that Alvarez — at

six foot, four inches and 260 pounds — could retrieve the weapon and use it before D.M. — at five foot, one inch — could escape through a door purposefully blocked by Alvarez using two closet doors.

Alvarez also challenges D.M.'s veracity, pointing out that although she testified she had never had anal or vaginal sex before, semen was found in her underwear and it is undisputed that the semen did not belong to Alvarez. Moreover, D.M. admitted to being bisexual and having a sexual relationship with a woman. According to Alvarez, these conflicts suggest D.M. was not truthful and therefore should not have been believed regarding her claim about the gun. However, the jury is the exclusive judge of the credibility of witnesses and may accept or reject all *or any portion* of a witness's testimony. *Orellana*, 381 S.W.3d at 653. (emphasis added). Thus, the jury might not have believed D.M.'s testimony regarding her lack of sexual experience, but still believed Alvarez threatened D.M. with a gun, placing her in imminent fear of serious bodily injury. Accordingly, we hold the evidence was legally sufficient to support the conviction and overrule this point of error.

### *Sufficiency of the Evidence — Attorney's Fees*

In his second point of error, Alvarez contends the trial court erred in imposing attorney's fees because there is no evidence to support the imposition of such fees. The State agrees, as do we.

A trial court may assess attorney's fees against a defendant who had court-appointed counsel if the court determines the defendant has financial resources enabling him to offset, in part or in whole, the costs of legal services provided. *Ramirez v. State*, 432 S.W.3d 373, 377 (Tex. App.—San Antonio 2014, pet. ref'd) (citing TEX. CODE CRIM. PROC. ANN. art. 26.05(g) (West Supp. 2014)). As this court stated in *Ramirez*, under Article 26.05(g), "the defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the

propriety of ordering reimbursement of costs and fees." 432 S.W.3d at 377 (citing *Cates v. State*, 402 S.W.3d 250, 251 (Tex. Crim. App. 2013)). And, as required by Article 26.05(g), the trial court must make "a *present* factual determination of the defendant's financial resources without speculation about possible future resources." *Ramirez*, 432 S.W.3d at 377. (emphasis added).

Here, the record reflects that although Alvarez initially retained counsel for trial, this representation was short-lived. In fact, approximately two months after retained counsel entered an appearance, the trial court appointed counsel for Alvarez. It is axiomatic that criminal defendants are not entitled to court-appointed counsel unless they are indigent. *See* TEX. CODE CRIM. PROC. ANN. art. 26.04. Thus, Alvarez was obviously indigent given the trial court's decision to appoint counsel. *See id.* Once the trial court determined Alvarez was indigent, we presume Alvarez remained indigent for the remainder of the proceedings absent a factual determination of a material change in his financial circumstances. *See Ramirez*, 432 S.W.3d at 377; TEX. CODE CRIM. PROC. ANN. art. 26.04(p).

According to the record, the trial court never made a finding that Alvarez's financial circumstances changed and he was able to re-pay the costs of court-appointed counsel. Accordingly, we hold there are insufficient facts in the record to justify the assessment of attorney's fees against Ramirez. *See* TEX. CODE CRIM. PROC. ANN. art. 26.05(g). We therefore sustain Alvarez's second point of error with regard to the imposition of attorney's fees and reform the trial court's judgment to delete the imposition of attorney's fees. *See Ramirez*, 432 S.W.3d at 377 (citing *Solomon v. State*, 392 S.W.3d 309, 311 (Tex. App.—San Antonio 2012, no pet.).

Marialyn Barnard, Justice

Do Not Publish