

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-12-00349-CR

Jessie **GUTIERREZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2008CR6341
Honorable Lori I. Valenzuela, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:        Catherine Stone, Chief Justice
               Marialyn Barnard, Justice
               Luz Elena D. Chapa, Justice

Delivered and Filed:  May 1, 2013

AFFIRMED

A jury found appellant Jessie Gutierrez guilty of murder. The trial court sentenced Gutierrez to sixteen years confinement and assessed a $10,000.00 fine. On appeal, Gutierrez complains the evidence adduced at trial was legally insufficient to support his conviction.[1] We affirm the trial court's judgment.

---

[1] Additionally, Gutierrez contends the trial court erred in denying his motion for directed verdict. A challenge to a trial court's denial of a motion for directed verdict is reviewed under the same standard used to review a legal sufficiency challenge. *Sony v. State*, 307 S.W.3d 348, 353 (Tex. App.—San Antonio 2009, no pet.) (citing *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996)). Thus, by complaining about the denial of his motion for directed verdict, Gutierrez has not raised any additional issue for our review. *See id.*

**BACKGROUND**

The evidence shows that in the early morning hours of April 5, 2008, a fight broke out at the Madison Avenue Pub and quickly escalated to include numerous individuals. Eventually, the club staff directed the participants outside in an effort to diffuse the situation, but as the club cleared, the victim in this case, José ("Joe") Mares, was discovered on the floor with a single stab wound to the chest.

*General Witness Testimony*

There were numerous witnesses called at trial. Most of the witnesses were pub employees or patrons who were at the pub on the night Mares was killed. However, there were also law enforcement witnesses and a witness from the Medical Examiner's Office.

There was testimony Mares had been to the pub before. On this particular evening, he and a friend, Ricardo Mendiola, met a group of friends at the pub, including Alan Garza, Christine De La Rosa, and Jessica Mata. That same night, Gutierrez and his friends, Brandon Garza and Jesse Garza, went to the pub where they also met with friends. It was Gutierrez's first time at the pub. A witness testified he and his two friends were almost denied entry by one of the club's owners after the owner observed Jesse Garza's facial tattoos. However, they were admitted when an employee of the club who knew Brandon Garza and Gutierrez vouched for them.

Several witnesses testified that around closing time, Mares's friend Mata was involved in an altercation with another woman at the club and was consequently escorted outside. Following this initial incident, a larger fight erupted that included Mares and Gutierrez. Evidence showed some of the men were drinking, using drugs, or both. Pub employees testified they tried to get the fight under control by ushering the participants outside. It was then Mares was found on the floor with a stab wound to the chest.

At trial, the State presented several witnesses who testified Gutierrez wore a shirt with blue and white stripes the night of the murder, although descriptions of the shirt varied somewhat. Some witnesses also testified the man in the blue and white shirt had a knife. Other witnesses specifically testified Gutierrez had a knife the night of the murder.

With regard to the injuries Mares sustained, the State called Dr. Randall Frost, the Bexar County Medical Examiner. Based on the autopsy, Dr. Frost concluded Mares's cause of death was a stab wound to the chest.

### *Testimony from Pub Personnel*

Andrew Tejeda was the pub owner and general manager for Madison Avenue Pub. He was at the pub on the night of the murder. At trial, he identified Gutierrez as one of the men he had initially refused to allow into the pub. These were the same men he later saw in a "squaring off" with other male pub patrons. He told the jury that before the fight broke out, he took a beer away from Gutierrez and told him, "Hey, you need to calm down." Tejeda testified Gutierrez had been wearing what he believed was a blue and white striped shirt. He told the jury he came into contact with Gutierrez outside the pub after the fight had been contained, and Gutierrez had taken off the striped shirt and slung it over his shoulder. Tejeda said Gutierrez then told him one of his friends had been injured and he "did what he had to do." Tejeda stated that after speaking with Gutierrez, he went back inside the pub and saw someone lying on the floor. He then ran back outside to try to catch Gutierrez or get his license plate number.

Robert Pulley was the pub employee who had vouched for Gutierrez and his friends that night, granting them access to the pub. Pulley had known Brandon Garza for years. He testified he knew Gutierrez, but admitted he had only met him once. Pulley testified Gutierrez was wearing a polo shirt, and he believed it had white and blue stripes. Pulley stated he helped break up the initial fight, escorting one woman outside. When he went back inside the pub, a larger

fight had broken out. Pulley said the pub owner told him to escort Gutierrez and Brandon Garza outside; Pulley testified the men were "really tensed up" and "angry."

Glen Johnson was one of the bouncers working at the pub that night. When two women began fighting, he stepped in to break up the fight. He testified he saw a man wearing a blue and white striped polo with a knife in his right hand and a broken pool stick in his left. Johnson admitted he did not see the man use the knife. Johnson escorted two people outside and when he returned, he saw Mares walking away and Gutierrez running out of the pub, taking off his shirt. He stated Gutierrez was yelling angrily at Mares. Johnson identified Gutierrez from a photo line-up, and again at trial, as the man with the knife. Johnson testified he heard Gutierrez tell Mares he was going to kill him and minutes later he saw Mares walk away and collapse. He stated Gutierrez was yelling at Mares, saying either, "I'm going to get you," or "I'm going to kill you."

Jennifer Galdeano was the pub manager on duty the night of the murder. She estimated fifty people were in the pub at the time of the fight. She testified that as she was ushering people out of the pub after the fight, she noticed a man wearing a white and blue polo shirt enter the bar and knock over a stanchion, which hit her foot. She continued to make her way to the back of the pub where the fight had taken place. She then heard the bartender, Veronica Salas, screaming, "he has a knife." Galdeano said Salas was referring to the man in the blue and white shirt. Galdeano also testified she saw the man in the blue and white striped shirt with a knife. In fact, she had been "poked" by the knife he was holding, causing her to bleed. Later, she noticed he had taken off the blue and white shirt and put it around his neck.

Galdeano also knew Mares, who she called a regular of the pub. After the larger brawl started, she tried to break it up; she then saw Mares collapse on a friend. Shortly thereafter, she

saw the man with the knife, who had been wearing the blue and white striped shirt, walk by her toward the main entrance. She told one of the pub employees to "get him, he has a knife."

Veronica Salas was the bartender at the pub that night. She confirmed the initial fight between the two women and the subsequent escalation into a larger brawl. Salas testified she saw someone wearing a blue and white striped polo shirt reach into his pocket and pull out a knife. She told the jury she had seen that person earlier with a tattooed man. Immediately after she saw the man with the knife, she saw Mares walk away from the fight and collapse. She dragged Mares behind the bar and called 911. She later picked Gutierrez out of a photo line-up, identifying him as the man with the knife. However, she admitted she was only eighty percent positive about the identification. Nevertheless, at trial she identified Gutierrez as the man with the knife who was wearing the blue and white striped polo shirt.

### Testimony from Mares's Friends

Mendiola, the friend who accompanied Mares to the pub that night, testified that before the fight broke out, he went to the men's restroom. While in the restroom, three men insulted him; he felt uneasy. He left the restroom and returned to the pool table near Mares. The three men exited the restroom and glanced in Mediola's direction. Mendiola testified Gutierrez and another man with a Playboy bunny tattoo were two of the three men from the restroom. Mendiola testified he and his friends and the men from the restroom were staring and "talking sh-- to each other." Ultimately, a fight broke out between the two groups after Mata's altercation with the other woman. Mendiola testified he saw Gutierrez, who was wearing a blue and white collared polo shirt, with a knife. Mendiola said he picked up a pool stick and struck the man with the tattoos on the head. He fought the man with the tattoos until the bouncers broke it up. Mendiola said he then escorted Mata outside. Mendiola told the jury he saw Gutierrez exit the

bar shortly before he heard yelling from inside the bar. Mendiola then ran back into the bar and saw people surrounding Mares, applying pressure to a stab wound.

Two days after the murder, Mendiola identified Gutierrez from a photo-line up as the man from the restroom with a knife. Mendiola provided two separate statements to police. In his first statement, he told police the man with the tattoo was the one with the knife. However, in his second statement, he identified Gutierrez as the man with the knife, explaining he made a mistake in his first statement. Mendiola also stated that Gutierrez was wearing a blue and white, collared striped "Polo, Ralph Lauren shirt."

Alan Garza, who was a friend of Mares, was also at the pub that night. When the fighting started, he saw Mares in a verbal confrontation with two men. Alan Garza testified one of the men pulled a knife and threatened Mares. The man who pulled the knife was wearing a blue and white striped polo shirt. Alan Garza testified he did not recall seeing anyone else wearing a similar shirt at the pub that night. Garza told the jury he saw Mares punch the shorter, bald man and begin to scuffle with both men. Garza said he intervened and pulled the smaller, bald man without the knife away from Mares. He then went to go look for his girlfriend. When Garza returned, he found Mares lying on the floor. He tried to help Mares but was ushered out of the pub by the bouncer. Once outside, he saw the man he had previously seen with the knife. Alan Garza subsequently identified Gutierrez from a line up approximately two months after the incident, but admitted he was not certain.

Christine De La Rosa, a long-time friend of Mares, was at the pub the night of the murder. She arrived with Mata shortly after midnight. De La Rosa testified that at one point she saw men at the pub arguing and "exchanging words." Her friend Mata had lost her keys and she was looking for them during the commotion. De La Rosa told the jury a man wearing a dark blue polo shirt with white stripes was involved in the argument and had his arm stretched out

holding a knife. She provided police a physical description, but admitted she did not get a good look at the man's face.

Jessica Mata, a friend of Mares, was involved in the initial confrontation and was escorted from the bar. However, she testified she saw Mares fighting with someone. When Mata heard people screaming "Joe," she ran back into the pub and saw Mares lying on the floor.

### *Testimony from Gutierrez's Friends*

Brenda Oncken worked at a restaurant with Gutierrez. She also spent time with him socially and testified she knew his friends Brandon Garza and Jesse Garza. She stated she and her boyfriend met Gutierrez and his friends at the pub on the night of the murder. Oncken told the jury the group stayed until closing time. She testified she saw Brandon Garza get hit on the head with a beer bottle. Shortly thereafter, she walked outside with him but did not see Gutierrez or Jesse Garza outside. The two men joined her outside a few minutes later. She testified Gutierrez told her the next day at work he stabbed someone the night before but did not think he killed him. According to Oncken, Gutierrez explained he did it to protect his friend Jesse Garza, the short, bald man with the Playboy bunny tattoo. She also testified she had seen Gutierrez with a knife at work.

Gutierrez called several witnesses at trial, including Brandon Garza and Azalea Escobedo. Brandon Garza stated he was a victim in the fight at the pub. He claimed he was hit in the head with two full beer bottles and that Gutierrez helped him make his way outside. He stated he did not see anyone holding a knife. However, Brandon Garza admitted to police he was not a good witness because he had a lot to drink that night and was blinded by glass and blood in his eyes. Brandon Garza also admitted he later went to the hospital and had two CAT scans which showed he suffered swelling of the brain. On cross-examination, he said he lost sight of everyone in the fight and did not know if Gutierrez had stabbed anyone.

Azalea Escobedo joined two female friends at the pub that night. She did not know Gutierrez or his friends until they had some interaction that evening when the two groups were socializing. She described one man in the group as wearing a yellow-like shirt and another in blue stripes. Escobedo testified she did not see the fight or the stabbing. However, she testified that outside the pub after the fight, the man in the yellow-like shirt with tattoos on his face had a knife in his hand and told her she should leave because he thought he had killed someone. She later admitted she had not seen the man in possession of the knife while they were inside the bar. She told the jury the man with the knife outside was not Gutierrez.

### *Testimony from Law Enforcement*

San Antonio Police Officer David Lohaus was dispatched to the pub. When he arrived, Officer Lohaus saw a man, later identified as Mares, lying on the pub floor. When emergency services arrived, they pronounced Mares dead. Officer Lohaus and other SAPD officers investigated the crime. Officer Lohaus testified he identified witnesses for initial questioning and follow up. Several witnesses were interviewed that morning and in the following two months.

San Antonio Police Detective Randal Hines led the subsequent investigation. He testified he read witness statements and developed a suspect, Gutierrez. Detective Hines spoke to Gutierrez and asked to search his home. The detective was looking for a particular item, a shirt described as a white polo shirt with blue stripes. Detective Hines had learned from witnesses that a shirt of that description was worn by a man seen with a knife inside the pub when Mares was murdered. In fact, several witnesses reported the man who stabbed Mares wore a white polo shirt with blue stripes. Gutierrez refused to consent to the search, but told the detective he was unable to find a shirt matching that description after conducting a search himself.

In his investigation, Detective Hines also spoke with Brandon Garza and Jesse Garza who had accompanied Gutierrez to the pub. The detective told the jury Jesse Garza had several visible tattoos, including a Playboy bunny on his neck and "SA" on his cheek.

San Antonio Police Detective Guillermo Mendoza was also assigned to the case. Detective Mendoza testified he had shown photo spreads that included Gutierrez to several witnesses. He stated five witnesses identified Gutierrez as the person with the knife inside the pub the night Mares was killed. The detective admitted one witness was not positive and none of the witnesses interviewed had actually seen the stabbing.

## ANALYSIS

In a single point of error, Gutierrez contends the evidence was legally insufficient to support his conviction. Specifically, he argues that despite the number of witnesses called by the State, no one testified they saw him stab Mares.

### *Standard of Review*

An appellate court reviews the legal sufficiency of the evidence in a criminal case under the standard announced by the Supreme Court in *Jackson v. Virginia*. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex .Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Mayberry v. State*, 351 S.W.3d 507, 509 (Tex. App.—San Antonio 2011, pet. ref'd). In applying this legal sufficiency standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Orellana v. State*, 381 S.W.3d 645, 652 (Tex. App.—San Antonio 2012, pet. ref'd) (citing *Mayberry*, 351 S.W.3d at 509); *see Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899. Therefore, we must defer to the jury's weighing of the evidence, resolution of conflicts in the testimony, and assessment of credibility. *Brooks*, 323 S.W.3d at 899; *Orellana*, 381 S.W.3d at 653 (citing *Jackson*, 443 U.S. at 319) (taking into

account the trier of fact's duty "to resolve conflicts in the testimony to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."). We must resolve any inconsistencies in favor of the verdict. *Gonzales v. State*, 330 S.W.3d 691, 694 (Tex. App.—San Antonio 2010, no pet.) (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)). Thus, in our analysis of a legal sufficiency challenge, we must determine whether the necessary inferences are reasonable based on the combined force of the evidence, direct and circumstantial, when viewed in the light most favorable to the verdict. *Orellana*, 381 S.W.3d at 654 (citing *Mayberry*, 351 S.W.3d at 509); *see Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (holding standard of review is same for both direct and circumstantial cases).

We must also remain mindful that an appellate court cannot reweigh the evidence or substitute its judgment for that of the jury. *Orellana*, 381 S.W.3d at 653 (citing *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000)). The jury is the exclusive judge of the credibility of witnesses and the weight to be given to their testimony, and the jury may accept or reject all or any portion of a witness's testimony. *Orellana*, 381 S.W.3d at 653 (citing *Lancon* v. *State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008)). The jury maintains the power to draw reasonable inferences from basic facts to ultimate facts; and their sole province is to reconcile any evidentiary conflicts. *Orellana*, 381 S.W.3d at 653 (citing *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995); *Welch v. State*, 993 S.W.2d 690, 693 (Tex. App.—San Antonio 1999, no pet.)).

"Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt," so long as the State meets its burden of proving each of the required elements of the charged offense beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Orellana*, 381 S.W.3d at 653. As the Third Court of Appeals explained in *Roberson v. State:*

> The State may prove its case by circumstantial evidence if it proves all of the elements of the charged offense beyond a reasonable doubt. The sufficiency of the evidence is determined from the cumulative effect of all the evidence; each fact in isolation need not establish the guilt of the accused. It is important to remember that all the evidence the jury was permitted, properly or improperly, to consider must be taken into account in determining the sufficiency of the evidence.

16 S.W.3d 156, 164 (Tex. App.—Austin 2000, pet. ref'd) (internal citations omitted). And, as is relevant to the case before us, the identity of an alleged perpetrator may be proven by circumstantial evidence. *See Orellana*, 381 S.W.3d at 653.

### *Application*

In the present case, Gutierrez was convicted of murder. Accordingly, the State was required to present evidence establishing beyond a reasonable doubt that Gutierrez intentionally or knowingly caused Mares's death or that he intended to cause Mares serious bodily injury and then committed an act clearly dangerous to human life that caused his death. *See* Tex. Penal Code Ann. § 19.02b(1)(2) (West 2011).

As detailed above, the evidence produced by the State included the following: (1) testimony from several witnesses who stated Gutierrez wore a blue and white striped shirt at the pub on the night of the murder; (2) testimony from several witnesses who saw a man wearing a blue and white striped shirt with a knife around the time of the murder, and that this man was the only person seen with a knife in the pub at the time of the incident; (3) testimony Gutierrez was the only person in the pub that night seen wearing such a shirt; (4) testimony from at two least witnesses who saw Gutierrez remove his shirt, placing it over his shoulder; (5) testimony Gutierrez fought with Mares, and had a knife during the fight; (6) testimony Gutierrez yelled at Mares, stating he was going to kill him or get him; (7) testimony Gutierrez, immediately after the murder, said he had done what he "had to do" to protect his friend; (8) testimony the man in the

blue and white shirt walked by Mares with a knife in his hand immediately before Mares collapsed; and (9) testimony from Gutierrez's co–worker that the day after the murder Gutierrez admitted stabbing someone the night before.

Gutierrez contends the evidence was legally insufficient because no rational jury would have believed beyond a reasonable doubt that he murdered Mares on the basis of that evidence alone. More specifically, Gutierrez argues no witness testified to actually seeing him stab Mares, and there was no physical evidence linking him to the murder. Stated differently, Gutierrez asserts the State, in presenting only circumstantial evidence, failed to establish beyond a reasonable doubt that if Mares was stabbed by someone, that Gutierrez, and not one of the other patrons at the pub that evening, stabbed him. However, as noted above, the State may prove its case by circumstantial evidence so long as it meets its burden of proving each of the required elements of the charged offense beyond a reasonable doubt. *Hooper*, 214 S.W.3d at 13; *Orellana*, 381 S.W.3d at 653. Furthermore, the jury maintains the power to draw reasonable inferences from basic facts to ultimate facts; and its sole province is to reconcile any evidentiary conflicts. *Orellana*, 381 S.W.3d at 653.

The evidence in the record clearly puts Gutierrez at the pub at the time of the murder. Further, a rational jury could infer from the evidence presented that Gutierrez stabbed Mares. Numerous witnesses present at the time of the fight identified Gutierrez as the man wearing the blue and white striped shirt who was holding a knife—the only such person seen with a knife that night. Gutierrez fought with the victim and was heard threatening to "kill" or "get" the victim. Gutierrez confessed to stabbing someone the day after the murder. Mares's cause of death was a stab wound to the chest.

Viewing all of the evidence in the light most favorable to the jury's verdict, we hold the State met its burden and the evidence was legally sufficient to support Gutierrez's conviction for the murder of Mares. Accordingly, we overrule Gutierrez's sole point of error.

## CONCLUSION

Based on our review of the arguments, the record, and the applicable law, we overrule Gutierrez's point of error and affirm the trial court's judgment.

Marialyn Barnard, Justice

Do Not Publish