

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-15-00122-CR

Carlos Bernard **SMITH**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2013CR8656
Honorable Sid L. Harle, Judge Presiding

Opinion by:　Marialyn Barnard, Justice

Sitting:　　Karen Angelini, Justice
　　　　　Marialyn Barnard, Justice
　　　　　Luz Elena D. Chapa, Justice

Delivered and Filed:　April 13, 2016

AFFIRMED

A jury found appellant Carlos Bernard Smith guilty of murder. Based on the jury's recommendation, the trial court sentenced Smith to confinement for forty years. On appeal, Smith presents three points of error, contending the evidence is legally insufficient to support his conviction and the trial court erred in refusing to instruct the jury on the affirmative defense of duress and the lesser included offense of criminally negligent homicide. We affirm the trial court's judgment.

**BACKGROUND**

The evidence shows Smith and Joyce Kidd, who were dating, were riding together in Ms. Kidd's Toyota Camry. According to Smith, as they approached the crest of a bridge, Ms. Kidd, who was driving, leaned over and was "slobbering" and drooling." Because Ms. Kidd was unable to control the Camry, Smith grabbed the steering wheel and steered the car off the bridge and on to a side street. He and at least one witness called 911.

It was subsequently determined that Ms. Kidd had sustained a three-inch knife wound to her chest that penetrated the aorta. Initially, Smith denied any involvement in the stabbing. Later, however, Smith claimed that as they were driving on the bridge, he and Ms. Kidd were arguing and she acted as if she was going to drive off the bridge. Smith, who claimed he had been cleaning his fingernails with a knife at the time, stated that out of fear, he "hit" Ms. Kidd with the knife.

Ultimately, Smith was charged with murder. Smith requested and received a jury instruction on the lesser included offense of manslaughter. He also requested an instruction on the lesser included offense of criminally negligent homicide, and the affirmative defense of duress, but the trial court denied the requests. As noted, the jury found Smith guilty of murder. The trial court sentenced Smith to forty years' confinement. Smith subsequently perfected this appeal.

**ANALYSIS**

As previously noted, Smith raises three points of error on appeal. He first challenges the sufficiency of the evidence to support his conviction. Thereafter, he challenges the trial court's refusal to give jury instructions on duress and criminally negligent homicide.

*Legal Sufficiency*

With regard to his sufficiency challenge, Smith argues the State's case was circumstantial and there was no evidence of motive. In response, the State argues the evidence, particularly

Smith's conflicting statements, was sufficient to permit the jury to conclude Smith intentionally or knowingly stabbed the victim, which led to her death.

*Standard of Review*

When reviewing sufficiency of the evidence in a criminal case, we apply the Supreme Court's legal sufficiency standard as set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Ford v. State*, 444 S.W.3d 171, 177 (Tex. App.—San Antonio 2014), *aff'd*, 477 S.W.3d 321 (Tex. Crim. App. 2015) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010)). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Mayberry v. State*, 351 S.W.3d 507, 509 (Tex. App.—San Antonio 2011, pet. ref'd) (citing *Jackson*, 443 U.S. at 319).

The jury is the sole judge of a witness's credibility and the weight to be given his testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). It may accept or reject all or any part of a witness's testimony. *Orellana v. State*, 381 S.W.3d 645, 653 (Tex. App.—San Antonio 2012, pet. ref'd) (citing *Lancon*, 253 S.W.3d at 707). Jurors may draw reasonable inferences from basic facts to ultimate facts and it is within their sole province to reconcile any evidentiary conflicts. *Orellana*, 381 S.W.3d at 653 (citing *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995)); *see Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Accordingly, an appellate court must remain mindful not to reweigh the evidence or substitute its judgment for that of the jury. *Orellana*, 381 S.W.3d at 653 (citing *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000)). We must, instead, defer to the jury's weighing of the evidence, resolution of conflicts in the testimony, and assessment of credibility. *See Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013) (citing *Brooks*, 323 S.W.3d at 899). If the necessary inferences are reasonable and the cumulative force of all the incriminating circumstances is sufficient to support

the conviction, a reviewing court will not disturb a jury's findings. *See Hooper*, 214 S.W.3d at 13 (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

*Application*

As stated above, Smith argues the State's case is circumstantial and there is no evidence of motive. First, motive is not a required element in criminal cases. *See Pollard v. State*, 255 S.W.3d 184, 188 (Tex. App.—San Antonio 2008), *aff'd*, 277 S.W.3d 25 (Tex. Crim. App. 2009). Second, "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13; *see Stobaugh v. State*, 421 S.W.3d 787, 842 (Tex. App.—Fort Worth, 2014), *pet. ref'd*, 455 S.W.3d 165 (Tex. Crim. App. 2015). Thus, neither the absence of evidence as to motive nor the absence of direct evidence supports Smith's claim that the evidence is insufficient. *See Hooper*, 214 S.W.3d at 13; *Pollard*, 255 S.W.3d at 188. We will review the evidence pursuant to the proper standard and determine whether the evidence produced by the State is legally sufficient to support the murder conviction.

To obtain a murder conviction under the facts of this case, the State was required to prove beyond a reasonable doubt that Smith (1) intentionally or knowingly caused the death of Ms. Kidd, or (2) intended to cause serious bodily injury to Ms. Kidd and committed an act clearly dangerous to human life that caused Ms. Kidd's death. *See* TEX. PEN. CODE ANN. § 19.02 (West 2011). We hold the evidence is sufficient for the jury to have convicted Smith for the murder of Ms. Kidd.

The evidence shows Victor Brown and a friend were driving on a bridge when they saw a Camry traveling between seven and ten miles per hour on the bridge. Because this was unusual, they followed the Camry "to see if everything was okay." They saw a woman inside the Camry slumped over, so they continued to follow. After slowly crossing the bridge, the Camry made a turn and came to rest. When the Camry stopped, a man, later identified as Smith, got out of it.

Brown testified he looked "spooked." Brown walked over to the Camry and saw a woman, later identified as Ms. Kidd, sitting in the driver's seat with blood coming from her chest and mouth. Brown stated he spoke to Smith, who "played all innocent like he didn't know what was going on," acting as if he had also just walked up to the Camry. According to Brown, Smith denied knowing what was wrong with Ms. Kidd. Brown's friend and Smith called 911.

Officer Charles Hiller of the San Antonio Police Department ("SAPD") was dispatched to the scene. He learned Ms. Kidd was in the ambulance with a stab wound to her chest. It was later determined the wound was approximately three inches deep and the knife had penetrated the aorta. Officer Hiller was asked by the "handling officer" to speak to Smith. After speaking to him, Officer Hiller believed Smith was intoxicated — he smelled alcohol on Smith's breath and Smith "wasn't exactly making sense." He also noticed Smith had blood on his hands. At that point, Officer Hiller frisked Smith for weapons and placed him in the back of his patrol car.

Members of the crime scene investigation unit arrived and blood samples were taken from the vehicle — all of the blood was found on the driver's side of the Camry. As noted, Smith had blood on his hands as well. A detective asked the unit members to search for a knife, but no knife was found at that time.

The evidence shows that after Tom McNelly, a homicide detective with SAPD, arrived at the scene, he learned Smith, who had been dating Ms. Kidd for approximately three months, was the last person with Ms. Kidd before her death. Detective McNelly asked Smith to accompany him to police headquarters. Smith agreed. Detective McNelly and two other detectives removed Smith from the patrol car and took him to police headquarters. Before they left and during the ride downtown, Detective McNelly recorded his conversation with Smith.

During their initial conversation, Smith told the detectives that while they were driving, a man waved at Ms. Kidd. According to Smith, Ms. Kidd stopped and got out of the Camry to speak

to the man, who Smith described as an African-American male wearing jeans and a brown shirt. Smith stated that after speaking with the man, Ms. Kidd returned to the Camry and they drove off. As they drove, Smith said Ms. Kidd began "breathing hard" and "slobbering." Smith stated Ms. Kidd could no longer drive, and as they were crossing a bridge, he had to reach over and steer the vehicle. Smith described Ms. Kidd as "delusional." Smith said he got out of the Camry and called 911. He denied knowing what happened to Ms. Kidd.

When they arrived at police headquarters, Detective McNelly continued his conversation with Smith. Smith stated Ms. Kidd picked him up. At that time, she appeared fine, but she was angry because she smelled beer on his breath. As they drove, they argued about his drinking and smoking — she claimed he did not love her. He then repeated the same story he had told the detectives during the ride to police headquarters — that a man had waved at Ms. Kidd and she stopped, told Smith "just a minute," got out of the Camry, and spoke to the man. After a few minutes, she got back into the Camry and they drove off — she did not identify the man and Smith did not know who he was, nor did he ask. In fact, Smith claimed Ms. Kidd said nothing at all when she got back in the vehicle — they did not resume their conversation about his drinking, etc. Then, not long after she began driving, as they approached the crest of a bridge, the vehicle began to slow; Ms. Kidd began to lean over — she was "slobbering" and "drooling." Smith began asking her what was wrong. Ms. Kidd was no longer able to drive, so Smith, who could not reach the brake, steered the Camry off the bridge and onto a side street. They coasted to a stop. When they stopped, he shook her, again asking her what was wrong, but she did not respond. Smith saw some blood — a "wet, red" area on her chest, but said he had no idea what had happened to Ms. Kidd. He called 911. Smith denied doing anything to Ms. Kidd and was allowed to leave the police station after the interview.

The record shows law enforcement continued its investigation after the initial interview with Smith. The investigation included speaking to witnesses, searching for the man Smith claimed he saw with Ms. Kidd, searching for evidence of a crime scene in the area where Ms. Kidd allegedly spoke to the unknown man, and searching for the murder weapon. Detective McNelly also learned Ms. Kidd was disabled and could only drive using her left arm and foot, which she had been doing for ten years. Her disability resulted from a stroke she suffered after surgery to remove a brain tumor. Ultimately, enough evidence was gathered to permit Detective McNelly to obtain an arrest warrant for Smith. When Smith learned there was a warrant for his arrest, he surrendered himself. Detective McNelly read Smith his *Miranda* rights; Smith waived his rights and agreed to speak with the detective.

In his post-arrest interview, which took place approximately two months after the initial interview, Detective McNelly explained they had evidence to prove Smith stabbed Ms. Kidd. The detective explained to Smith the potential charges could range from criminally negligent homicide to murder, depending on the circumstances. Detective McNelly said that without knowing what happened, they could not determine the seriousness of the charge for which Smith might be convicted. Smith initially asked Detective McNelly if they found a weapon. The detective declined to discuss the evidence with him.

After a time, Smith admitted he and Ms. Kidd had argued — she was angry he had been drinking. He asked Ms. Kidd to take him home. He told her he was no longer going to do her classwork for her — if he wanted to do homework, he would go to college himself — and that he was tired of her complaints. But when Smith told her he was unhappy with her sexually, Ms. Kidd became very upset, stopped, and turned the Camry as if she intended to drive off the bridge. Smith claimed he was terrified. Smith told the detective he was cleaning his fingernails with a knife during the argument and when Ms. Kidd veered as if to drive off the bridge, he felt as if he was in

"imminent danger" so he "hit" her in the chest. Because he had the knife in his hand, he ended up stabbing her, seeming to suggest he had forgotten he had the knife in his hand. Smith described his actions as a matter of "self-preservation."

Numerous witnesses saw the Camry on the bridge that day. None of the witnesses described the vehicle as veering as if to drive off the bridge. Rather, the witness all described the Camry as stopped or slowing and stopping.

Ultimately, Smith agreed to take law enforcement to the place where he discarded the knife used to stab Ms. Kidd. The knife was found, though Detective McNelly testified Smith was somewhat vague about the location. Although the knife was tested, no forensic evidence was recovered.

It is undisputed that only Smith and the victim were in the car. Victor Brown testified he saw Ms. Kidd slumped over in the Camry while it was on the bridge. Brown also testified Smith acted as if he had also just walked up to the Camry. It is also undisputed that the victim and Smith were arguing prior to the stabbing. In his statements to police, Smith made it clear that Ms. Kidd would not stop criticizing his behavior.

Smith seems to suggest there is no evidence that he acted intentionally or knowingly. However, intent may be inferred from circumstantial evidence, including acts, words, or the conduct of the defendant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Smith gave conflicting statements to police. He first denied any culpability in the crime, intimating that an unknown male may have been involved. He then claimed he only stabbed Ms. Kidd out of fear that she intended to drive them off the bridge. Witnesses, however, never saw Ms. Kidd veer as if to drive off the bridge. Rather, they saw the vehicle stopped or moving slowly. The jury was entitled to disregard both statements, believing Smith concocted both stories in an effort to shield himself. *See Orellana*, 381 S.W.3d at 653. The conflicting statements provide some evidence

Smith acted intentionally or knowingly. *See Kemmerer v. State*, 113 S.W.3d 513, 516 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (holding that jury could have viewed defendant's changing versions of events as evidence of guilt); *Loserth v. State*, 985 S.W.2d 536, 541–42 (Tex. App.—San Antonio 1998, pet. ref'd) (holding that evidence defendant initially lied to police was some evidence of guilt); *see also Hartson v. State*, 59 S.W.3d 780, 786 (Tex. App.—Texarkana 2001, no pet.) (holding that parties' conflicting statements were some evidence defendant had knowledge that codefendant passed forged instrument).

Moreover, it is undisputed that Smith disposed of the knife used to stab Ms. Kidd. Hiding a murder weapon after the commission of a murder is some evidence in support of a murder conviction. *See Castillo v. State*, 71 S.W.3d 812, 818 (Tex. App.—Amarillo 2002, pet. ref'd) (holding that evidence defendant threw weapon in lake was evidence from which rational jury could reasonably infer intent to kill); *see Miller v. State*, 177 S.W.3d 177, 194 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (holding that evidence defendant directed friend to bury murder weapon was attempt to hide evidence and was circumstantial evidence of defendant's guilt). The police had previously searched the area where the murder weapon was ultimately discovered, but were unable to find it. It was only after Smith took them to a particular area near where the Camry finally came to rest that officers were able to recover the knife.

Based on the foregoing evidence, as well as the other evidence in the record, and viewing in the light most favorable to the verdict, we hold the jury could have found the essential elements of the crime beyond a reasonable doubt. *See Mayberry*, 351 S.W.3d at 509. We therefore overrule Smith's first point of error.

### *Jury Instructions*

In his second and third points of error, Smith contends the trial court erred in failing to provide certain jury instructions. First, he claims the trial court erred in refusing to instruct the

jury on the affirmative defense of duress. Second, he claims he was entitled to an instruction on the lesser included offense of criminally negligent homicide.

*Standard of Review*

In reviewing alleged jury charge error, appellate courts engage in a two-step process. *Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015); *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). First, we determine whether there was error in the charge. *Cortez*, 469 S.W.3d at 598; *Kirsch*, 357 S.W.3d at 649. Second, if we find there was error in the charge, we must then determine whether sufficient harm resulted from the error to require reversal. *Cortez*, 469 S.W.3d at 598; *Kirsch*, 357 S.W.3d at 649.

1. *Duress*

Smith asserts he was entitled to an instruction on the affirmative defense of duress and the trial court erred in refusing to give the instruction. Smith argues that because Ms. Kidd "threatened to drive off the bridge," and this threat "scared" him, causing him to stab Ms. Kidd, the jury should have been instructed on the affirmative defense of duress.

It is an affirmative defense to prosecution that the defendant engaged in the prohibited conduct "because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another." TEX. PEN. CODE ANN. § 8.05(a). That is, a defendant may be justified in committing the offense if he did so under duress. *See id.* Courts have recognized that duress is, on its face, a confession-and-avoidance or "justification" type of affirmative defense. *See, e.g., Farmer v. State*, 411 S.W.3d 901, 917 (Tex. Crim. App. 2013); *Gomez v. State*, 380 S.W.3d 830, 834 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (citing *Rodriguez v. State*, 368 S.W.3d 821, 824 (Tex. App.—Houston [14th Dist.] 2012, no pet.)). It is in the nature of a confession-and-avoidance defense because "this justification, by definition, does not negate any element of the offense, including culpable intent; it only excuses what would otherwise constitute criminal

conduct." *Gomez*, 380 S.W.3d at 834 (citing *Juarez v. State*, 308 S.W.3d 398, 401–03 (Tex. Crim. App. 2010) (defining defense of necessity as confession-and-avoidance or "justification" defense); *Shaw v. State,* 243 S.W.3d 647, 659 (Tex. Crim. App. 2007) (defining Good Samaritan defense as confession-and-avoidance or "justification" defense)).

The confession-and-avoidance doctrine requires a defendant first to admit he engaged in the prohibited conduct by admitting to all elements of the underlying offense, including the applicable mental state, and then to claim his commission of the offense was justified because of other facts. *Gomez*, 380 S.W.3d at 834. With regard to duress specifically, "the other facts" must show the defendant acted out of fear due to a threat of imminent death or serious bodily injury. *See* Tex. Pen. Code Ann. § 8.05(a). A defendant cannot establish his action was justified without first identifying, or admitting to the commission of, the predicate act. *Gomez*, 380 S.W.3d at 834. If the defendant fails to testify, stipulate, or otherwise offer evidence admitting he engaged in the prohibited conduct, he is denied the benefit of the defense of duress. *Id.* (citing *Shaw*, 243 S.W.3d at 659) (defendant is entitled to jury instruction on such defense only "when the defendant's defensive evidence essentially admits to every element of the offense, including the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct" (emphasis omitted)). In other words, when the defensive evidence merely attempts to negate an element of the offense, the defendant is not entitled to a defensive instruction on any defense subject to the confession-and-avoidance doctrine. *Cornet*, 417 S.W.3d at 451.

In this case, Smith neither testified, stipulated, nor otherwise proffered evidence that he "engaged in the proscribed conduct." Admittedly, the State introduced two of Smith's videotaped statements; however, those statements contain conflicting accounts of the incident. In the first, Smith completely denies any involvement with Ms. Kidd's death, suggesting it was an unknown male who stabbed her. In his second statement, he does not admit he (1) intentionally or knowingly

caused the death of Ms. Kidd, or (2) intended to cause serious bodily injury to Ms. Kidd and committed an act clearly dangerous to human life that caused Ms. Kidd's death. *See* TEX. PEN. CODE ANN. § 19.02. Smith's second statement suggested, at best, that he struck Ms. Kidd in the chest to prevent her from driving off the bridge, forgetting he had the knife in his hand. Thus, he did not admit he acted intentionally or knowingly. Moreover, the State's tender of the conflicting statements does not establish Smith admitted to the veracity of either statement. *See Gomez*, 380 S.W.3d at 835.

Accordingly, because Smith failed to testify, stipulate, or otherwise offer defensive evidence admitting he committed the offense of murder, we conclude he was not entitled to a jury instruction on the affirmative defense of duress. We overrule Smith's second point of error.

### 2. *Criminally Negligent Homicide*

Finally, Smith contends the trial court erred by refusing his requested instruction on the lesser-included offense of criminally negligent homicide. The State argues Smith was not entitled to the requested instruction, but even if he was, the trial court's refusal was harmless. We need not determine whether the trial court erred in refusing the requested lesser-included-offense instruction because we agree with the State that any error in refusing to submit the instruction to the jury was harmless.

A trial court's erroneous refusal to give a requested instruction on a lesser-included offense is subject to the harm analysis of *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). Because Smith requested the instruction, under an *Almanza* analysis, we are required to reverse only if the refusal to submit the requested instruction resulted in "some harm" to Smith. *See id.*

In *Saunders v. State*, 913 S.W.2d 564, 571 (Tex. Crim. App. 1995), the Texas Court of Criminal Appeals recognized that it "routinely found 'some' harm, and therefore reversed, when the trial court has failed to submit a lesser included offense that was requested and raised by the

evidence—at least where that failure left the jury with the sole option either to convict the defendant of the greater offense or acquit him." The court reasoned the defendant suffered "some harm" because the jury was denied the opportunity to fulfill its role as factfinder, i.e., it was not permitted to resolve the factual dispute as to whether the defendant committed the greater or lesser offense. *Id.*

However, the court in *Saunders* went on to recognize a defendant may not suffer any harm at all when a trial court submits one lesser-included offense raised by the evidence, but refuses to submit another that might have also been raised by the evidence:

> The jury's options [are] not limited to conviction of the greater offense or acquittal. Under these circumstances the *Beck* [*v. Alabama*, 447 U.S. 625, 634 (1980)] risk that the jury will convict of the greater offense despite its reasonable doubt is not so apparent. There is an available compromise. It is at least arguable that a jury that believed the defendant committed an uncharged lesser included offense, but unwilling to acquit him of all wrongdoing, and therefore inclined to compromise, would opt for a lesser included offense that was submitted rather than convict him of the greater offense.

913 S.W.2d at 572. Thus, a finding of some harm is not automatic when the jury is charged with regard to one requested lesser-included offense, but not another. *Id.*; *Levan v. State*, 93 S.W.3d 581, 586 (Tex. App.—Eastland 2002, pet. ref'd); *Jiminez v. State*, 953 S.W.2d 293, 300 (Tex. App.—Austin 1997, pet. ref'd). In fact, a wholly different situation is presented when the trial court submits one lesser-included offense but not another. As the court explained in *Jiminez*, if the jury had a reasonable doubt as to the defendant's guilt of the charged offense, but at the same time believed him guilty of some offense, it was not forced to choose between conviction and acquittal, but had the option of convicting him of the lesser offense that was submitted. 953 S.W.2d at 300. That a jury chose to find the defendant guilty of the greater offense as opposed to the submitted lesser-included offense is an indication that the trial court's refusal to give the *other* lesser-included offense instruction was harmless error. *Id.*

- 13 -

In this case, Smith requested an instruction on the lesser-included offense of manslaughter, which the trial court gave to the jury. But, as noted, the trial court refused to give an instruction on the lesser-included offense of criminally negligent homicide. The culpable mental states required for manslaughter and criminally negligent homicide are similar — each requiring assumption of a risk. *Levan*, 93 S.W.3d at 586 (citing *Thomas v. State*, 699 S.W.2d 845, 847 (Tex. Crim. App. 1985)). A person commits the offense of manslaughter "if he recklessly causes the death of an individual." TEX. PENAL CODE ANN. § 19.04(a). Section 6.03(c) of the Penal Code states a person acts recklessly "when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c). The risk involved must constitute "a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances" as viewed from the defendant's point of view. *Id.*

The court of criminal appeals has held that manslaughter and criminally negligent homicide both involve death caused by a risk created by the defendant. *See Levan*, 93 S.W.3d at 586 (citing *Thomas*, 699 S.W.2d at 849). If the defendant is aware of the risk his conduct creates but consciously disregards it, his conduct is reckless and, he is guilty of manslaughter. *Id.* On the other hand, if the defendant is unaware of the risk his conduct creates, he is guilty only of criminally negligent homicide — if he should have been aware of the risk his conduct created. *Id.*

Here, for the jury to convict Smith of either manslaughter or criminally negligent homicide, it would have to have found Smith did not cause Ms. Kidd's death intentionally or knowingly, but rather by some risk he created — either knowingly (manslaughter) or unknowingly (criminally negligent homicide). The trial court's inclusion of the instruction on manslaughter presented the jury with an option for convicting Smith for causing Ms. Kidd's death as a result of a risk created by his conduct. The jury rejected this option by finding Smith intentionally or knowingly caused Ms. Kidd's death. If the jury had harbored a reasonable doubt that Smith intentionally or

knowingly caused her death, it is unlikely it would have convicted him of murder anyway for lack of an acceptable compromise — the jury was given a compromise — manslaughter. *See Levan*, 93 S.W.3d at 586–87 (citing *Saunders*, 913 S.W.2d at 573–74). We hold it is more likely the jury convicted Smith of murder because it believed he intentionally or knowingly caused Ms. Kidd's death. *See id.* Accordingly, we hold the trial court's refusal to submit the requested instruction on the lesser-included offense of criminally negligent homicide was harmless. We overrule Smith's third and final point of error.

## CONCLUSION

Based on the foregoing, we hold the evidence was sufficient to support the murder conviction, the trial court did not err in refusing to submit an instruction on duress, and any error in refusing Smith's requested instruction on the lesser included offense of criminally negligent homicide was harmless. Accordingly, we affirm the trial court's judgment.

Marialyn Barnard, Justice

Do Not Publish