**Opinion issued February 25, 2021**



In The

# Court of Appeals

### For The

# First District of Texas

————————————

### NO. 01-19-00383-CR

————————————

### ISAIAH MURPHY, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

### On Appeal from the 176th District Court
### Harris County, Texas
### Trial Court Case No. 1582966

---

### MEMORANDUM OPINION

A jury convicted appellant, Isaiah Murphy, of the first-degree felony offense

of murder and assessed his punishment at confinement for twenty-five years.[1] In his

---

[1]  *See* TEX. PENAL CODE ANN. § 19.02(b)(1).

sole issue on appeal, appellant argues that the State failed to present sufficient evidence that he caused the death of Gerardo Lopez, the complainant.

As explained below, the State presented evidence that only about a minute and a half elapsed between the time that appellant and Lopez disappeared into an alley way and the time that appellant reemerged from the alley alone after Lopez was shot. A witness identified appellant in court as the person he saw in the alley immediately after hearing gunshots. This witness also testified that, within minutes of the shooting, he had a confrontation with appellant in which appellant pointed a gun at him and stated, "I'll shoot you, too." We affirm.

## Background

### A. The Shooting

The shooting incident here occurred in a neighborhood near the intersection of Cavalcade and Fulton streets in north Houston. The neighborhood contains a mixture of businesses and single-family homes. A light rail line runs north-south along Fulton Street, and there is a stop on the line, with a platform for passengers, immediately south of Cavalcade Street, which runs east-west. Immediately east of Fulton Street, two other streets also run north-south and are parallel to each other: McEwen Street and Siegel Street. Houses are located along both streets. A "back alley" or "easement" separates the backyards of the houses on McEwen from the backyards of the houses on Siegel. This alley was dark and not well-lit.

2

Witness Erika Medrano described the alley between the houses on McEwen and the houses on Siegel as "a little pathway with nothing but grass, but it goes through the back of all the houses down that street." She testified that some residents have their backyards open to the alley; some residents—like her—have a closed fence between their backyard and the alley; and some residents use the alley to enter their homes. She stated that some parts of the alley are clear, with grass like that typically found on a person's lawn, but other parts of the alley have trees, overgrowth, utility poles, and trash.

Around 9:00 p.m. on February 28, 2018, Medrano heard multiple gunshots coming from the direction of the alley. Medrano looked outside the window and saw "a male figure person standing there still and bending down." She could see that this man was wearing dark pants and a dark hooded sweatshirt, but she could not see his face. She could not see anyone with this man. He then ran out of the alley and in front of Dairy Land, a restaurant located at the southeast corner of Fulton and Cavalcade. Medrano then called 911.

In her 911 call, Medrano stated that she heard gunshots coming from behind her home. When asked by the dispatcher if she had seen anyone, Medrano said no. She also mentioned a silver Chevrolet Impala. At trial, she stated that she thought this car might be important because "when the person [running from the alley] stopped at the Dairy Land, that same car stopped in front of that person." The person

3

running from the alley did not get into this car. Medrano saw the person running from the alley and the driver of the car, another man, "just standing in front of each other." They appeared to have a conversation, but Medrano could not hear any words said between the men.

After calling 911, Medrano walked to her backyard "to see if anyone was there." While she was outside, she "heard a person trying to move around, someone moving in the back." Medrano called 911 a second time to report this new information. Medrano then went back outside. She did not leave her backyard, but in the alley, she saw a man lying face-down and unmoving on the ground. The man's pants pockets were "sticking out," and Medrano could see a flip phone lying on the ground near him. Medrano thought he looked familiar, but she could not identify him. This man was later identified as Gerardo Lopez, who lived nearby. Medrano could not see anyone or anything else in the alley. Medrano called 911 a third time to report the discovery of Lopez.[2] Medrano did not see anyone in the alley from the time she made her first 911 call until first responders arrived at her house.

Witness Jorge Elizondo also testified at trial. Around 9:30 p.m., he was in his driveway and was about to get into his car, a gray Chevrolet Impala. It was not noisy

_____

[2] Medrano first called 911—to report the gunshots and the man running by Dairy Land—at 9:45 p.m. The recording of Medrano's second 911 call does not include a timestamp to indicate when this call occurred. Medrano called 911 a third time—to report finding Lopez in the alley—at 10:21 p.m. She had not seen any police officers in the area by the time she made her second or third call.

4

outside, and he could not hear anyone talking or yelling. He then heard six gunshots coming from the direction of the alley behind his house. Elizondo ran towards his backyard, and he testified that he saw fire from a gun discharging and a man "coming out already" from the alley and walking towards Cavalcade. The man was wearing all black clothing: a black hooded sweatshirt, black pants, and black shoes. The man also "had dreadlocks with beads hanging down his forehead." Elizondo acknowledged that it was dark in the alley, but he stated that there were light poles in front of his house and on Cavalcade, and he could see a person in the alley. Elizondo identified appellant in court as the person he saw running from the alley.

Elizondo got into his car and drove to Cavalcade with the intent to follow and confront appellant. When Elizondo reached Cavalcade, which "just took seconds," appellant had "just barely [come] out" of the alley, and he was walking west along Cavalcade, towards the intersection with Fulton. Elizondo did not see anyone else walking on that part of Cavalcade or in the area of the alley. Elizondo turned onto McEwen and slowed down by the Dairy Land. He rolled his window down and asked appellant if he was "the one that just shot at my house." Appellant said something in response, but Elizondo did not hear what he said. Appellant then walked to the light rail platform, and Elizondo parked his car near the front doors of Dairy Land. Elizondo he got out of his car and accused appellant of shooting at his house. He testified that "right away [appellant] took his gun out." Appellant said, "I'll shoot

you, too," and started running towards Elizondo. Appellant tried to shoot Elizondo, but either the gun jammed or appellant ran out of bullets.

Because Dairy Land was closed, Elizondo took cover behind a car in the parking lot. Appellant told him, "I'm going to take your car now," and moved towards the open driver's side door of Elizondo's car. When Elizondo also moved towards his car, appellant ran westward towards Interstate 45. Elizondo got back into his car and followed appellant for three or four minutes as appellant ran through yards of houses in the neighborhood. Elizondo could not catch up to appellant. At some point, Elizondo called 911, but no recording of this call was admitted into evidence.

Witness Carlos Parrish testified that, on the night of the shooting, he was talking with two women at a bus stop on the north side of Cavalcade, directly across from Dairy Land. Parrish heard four gunshots. Both he and one of the women remarked on how it sounded like the gunshots were coming from close by. Parrish "saw some movement coming out of an alley and [he] saw somebody standing there." Parrish saw a man, whom he could not identify, walk west along Cavalcade towards Dairy Land. Parrish then saw a man in a silver car pull up to the man walking. The man in the car yelled about a shooting, and the other man started running towards Dairy Land. Parrish did not identify either of these men by name, and he did not identify appellant in court as one of the men he saw.

Parrish then witnessed a confrontation in the Dairy Land parking lot. According to Parrish, the man who had been the car—Elizondo—stated, "I saw what you just did." The man who had run towards Dairy Land—appellant—pulled a gun from his waistband, pointed it at Elizondo, and said, "I'll kill you." Parrish saw appellant attempt to shoot Elizondo, but the gun did not work. He saw Elizondo approach the locked doors to Dairy Land and appellant move towards Elizondo's car while saying, "I'll take your car." Appellant ran towards the light rail stop, and Elizondo got in his car, and "proceeded to jump the curb to run [appellant] over." Appellant then ran towards a convenience store located on the northwest corner of Fulton and Cavalcade. Parrish did not see what happened after this because the bus he had been waiting for arrived, and he left the area. Parrish testified that the person he saw was wearing all black, including a black hooded sweatshirt, and that he had dreadlocks.

## B. The Police Investigation

Houston Police Department (HPD) Sergeant Juan DeLeon received a call for service around 10:30 p.m. for the area around the intersection of Fulton and Cavalcade. HPD dispatch received a few calls about the shooting incident, with "different descriptions of what it was," and the officers were not certain where exactly the incident had taken place. DeLeon had been informed that the shooting might have occurred in or behind an unidentified caller's backyard. He stood on

7

Cavalcade and could see the alley itself, but, from that vantage point, he could not see anything in the alley. After speaking briefly with Medrano, DeLeon walked deeper into the alley and discovered Lopez lying face-down on the ground with his pants pockets turned out. Houston Fire Department (HFD) personnel—who had arrived at the scene around the same time that DeLeon did—approached Lopez and determined that he had passed away.

DeLeon testified that he had patrolled this particular area of Houston during the night shift for eight years and that he was familiar with the area. He stated that this area typically had "zero" foot traffic around 9:00 and 10:00 p.m. He also stated that Dairy Land and the other businesses near the intersection of Fulton and Cavalcade were closed by the time he started his shift at 10:00 p.m. However, he agreed with defense counsel that the nearby light rail stop does bring some foot traffic to the area.

HFD Captain David Perez, a paramedic, was dispatched in a fire truck and arrived at the scene shortly before any police officers. He did not observe anyone going into or coming from the alley, but he did see people standing in a backyard facing the alley. Perez did not speak to these people, and he did not identify them at trial. Perez walked into the alley with an HPD officer, and he saw Lopez lying face-down on the ground in the alley. He turned Lopez over, but Lopez did not have a

8

pulse and was not breathing. Lopez also had a visible head wound. Perez determined that Lopez was deceased.

Morgan Schilhab, a crime scene investigator with the Houston Forensic Science Center, processed the scene for evidence. Schilhab discovered a spent cartridge casing between Lopez's body and a chain link fence on the far side of the alley, bordering the backyard of a house facing Siegel. Schilhab found a live, or unfired, cartridge casing in between Lopez's leg and a large pole that was lying on the ground. Schilhab found crumpled receipts for two businesses on Fulton—both dated the afternoon of February 28—near Lopez's right leg and his left arm. HPD officers obtained a search warrant to search the backyard of the house on Siegel that was closest to where Lopez was found. Schilhab found three fired cartridge casings on the other side of the chain link fence from Lopez's body. All of the cartridge casings found at the scene were made by the same manufacturer and were the same caliber. Schilhab also found a coin and a lighter located near Lopez's body and a cell phone located under Lopez. Lopez's pants pockets were turned out, and Schilhab found several coins inside of the pockets. Schilhab did not recover a weapon from the scene.

Dr. Mary Anzalone, with the Harris County Institute of Forensic Sciences, performed the autopsy on Lopez. Lopez sustained five gunshot wounds: one gunshot wound to the right cheek; three gunshot wounds to the right upper chest; and one

gunshot wound to the right torso. Stippling was present around the gunshot wound to Lopez's face, indicating that the muzzle of the gun was likely around three to four feet from Lopez when fired. Dr. Anzalone testified that the gunshot wound to Lopez's face, two of the gunshot wounds to Lopez's chest, and the gunshot wound to Lopez's torso each would have been sufficient, by itself, to cause Lopez's death. Lopez had no wounds indicating that he had been involved in a fight before his death.

HPD Detective Kyle Heaverlo was one of the first detectives from the Homicide Division to be notified about the shooting. He arrived at the scene around 11:20 p.m., and he focused on searching the immediate area around where officers discovered Lopez's body as well as searching for locations in the neighborhood that might have surveillance cameras. Heaverlo discovered several surveillance cameras located at Dairy Land and the light right stop, and he noted these cameras for the detective who would be conducting the follow-up investigation. Heaverlo and the other detectives initially investigating the shooting had no leads on potential suspects beyond hearing that the suspect was a black male.

The day after the shooting, HPD Detective David Williamson was assigned to investigate Lopez's murder. As part of his investigation, Williamson collected surveillance videos from several locations near the scene, including the interior of a rail car, the platform of the light rail stop, Dairy Land, and a convenience store located at the northwest corner of Cavalcade and Fulton. The light rail stop had two

cameras facing north and two cameras facing south along the rail line. The Dairy Land had a camera facing Cavalcade. The trial court admitted video recordings of the footage from the cameras on the rail car, the light rail platform, and Dairy Land. The State did not introduce into evidence a recording of the footage from the convenience store.

Williamson testified that the footage from the convenience store depicted Lopez approaching and interacting with customers as they left the store. He stated that it appeared from the footage that Lopez did not know any of the customers and that he was asking for either money or a cigarette. Lopez did not appear threatening, and Williamson characterized all of these encounters as "friendly." Appellant did not appear on the footage from the convenience store.

The footage from inside the rail car depicted appellant riding the light rail around 9:25 p.m. Appellant was wearing dark shoes, dark pants, and a dark hooded jacket. He also had his hair in short dreadlocks.[3] The footage also depicted appellant leaving the rail car around 9:32 p.m. and sitting at a bench on the platform at the light rail stop. Lopez was on the platform at the same time, and he approached appellant. The footage depicted appellant conversing with Lopez. The footage did not have audio, but Williamson testified that their conversation "look[ed] like the

---

[3]    Both Detective Williamson and Elizondo testified that appellant had dreadlocks at the time of the shooting, but he had cut his hair by the time of trial.

same type of interaction [Lopez] has with other people before he has an interaction with Mr. Murphy. Possibly asking for something." Williamson stated, "Mr. Murphy appears to have an interaction with Mr. Lopez in which [appellant] uses the hand signal of rubbing his finger together with his thumb which is a common[] way of indicating money." According to Williamson, the hand gestures that appellant used "would imply that Mr. Murphy is requesting some sort of payment of some kind." Lopez then pointed to the east, "as if inviting Mr. Murphy to come with him to the east." This interaction between Lopez and appellant at the rail platform occurred at 9:35 p.m.

Appellant left the platform with Lopez and walked east along Cavalcade. Williamson testified that "[i]t appears very much that they're walking together." He stated:

> It appears to me in that they're walking together. They're walking in close proximity. The—Mr. Murphy stops and while he's walking he turns back to continue what appears to be a conversation with Mr. Lopez. Mr. Lopez is walking a little slower, then Mr. Murphy seems to be turning around and continuing a conversation with Mr. Lopez. And then Mr. Murphy at one point stops briefly as Mr. Lopez, he catches up to him.

The surveillance footage from Dairy Land also depicted appellant and Lopez walking east along Cavalcade. By 9:37 p.m., both men had left the view of the

12

cameras. The surveillance footage did not show anyone else walking from the light rail towards the alley, or walking from the alley towards the light rail.[4]

Approximately ninety seconds after appellant and Lopez disappeared from the view of the cameras, around 9:38 p.m., appellant reemerged walking west along Cavalcade, alone, towards the light rail stop. At 9:39 p.m., Elizondo's car appeared on the surveillance footage, and the car turned onto McEwen. Elizondo's car slowed down, and appellant looked over his shoulder and took a few steps towards Elizondo's car. Elizondo then continued driving, and appellant continued walking toward the light rail stop.

By the time Elizondo had pulled his car into the parking lot of Dairy Land, appellant had reached the rail platform. The footage of the rail platform depicted appellant appearing to have "an interaction or listening to somebody off camera to the east." Williamson testified that appellant used "big arm gestures" and ran from the platform towards Dairy Land. Appellant disappeared from the rail platform footage but immediately appeared on the Dairy Land footage, where he could be seen pointing an object at Elizondo. According to Williamson, appellant had "some difficulty with something in his hands." The footage then depicted appellant running

---

[4] At 9:38 p.m., the surveillance footage depicted an unidentified person walking east on Cavalcade and turning to walk south down McEwen. Williamson testified that he did not believe that this person walked towards the alley between McEwen and Siegel.

13

west across Fulton; Elizondo leaving the Dairy Land in his car and driving in the same direction appellant had been running; and appellant changing direction and running east across Fulton about 100 feet north of the intersection with Cavalcade.

The State had Elizondo view the Dairy Land surveillance footage during his testimony. The footage began around 9:35 p.m. and depicted two men walking along Cavalcade and towards the alley. Elizondo identified the men on the video as appellant and Lopez, whom Elizondo had known for most of his life. The surveillance video did not depict anyone else walking through the Dairy Land parking lot or along Cavalcade. Approximately two minutes after appellant and Lopez disappeared from the cameras, Elizondo's car appeared on the surveillance footage. The Dairy Land surveillance video also showed the confrontation Elizondo had with appellant in the parking lot. This confrontation was not audible on the surveillance footage. The footage ended with appellant running towards the light rail stop and Elizondo turning onto Fulton in his car.

At the time Williamson viewed the surveillance footage from the light rail stop and Dairy Land, he did not know appellant's identity. He had Elizondo meet with a sketch artist, and he took that sketch and still images from the surveillance footage on the rail car and distributed those to other law enforcement agencies and to the media. Williamson received a tip that the person in the images appeared to be

a student at a school in the immediate area of the shooting. Williamson spoke with the school principal, who identified the person in the images as appellant.

Williamson located appellant at a nearby apartment complex. Appellant agreed to speak with Williamson at the Homicide Division offices. He also agreed to provide a DNA sample.[5] The trial court admitted a recording of Williamson's interview with appellant. During the interview, appellant acknowledged that he was the person seen in the images publicly released by HPD. Williamson later learned that, before his interview with appellant, appellant had spoken to someone at a police station and told them that "he was told by a friend that he looked like the person in an image that was on the news and that he wanted to speak with police about that." Williamson did not know about this when he interviewed appellant.

During the interview, appellant described his actions on the night of the shooting. He stated that he had taken the light rail to the area to obtain food for friends and co-workers, and he acknowledged that he had been at the light rail stop at Fulton and Cavalcade. He stated that he sat on the bench at the platform and spoke

---

[5]     Swabs were taken of all four of Lopez's pants pockets to determine if any DNA was present. The swabs were compared to known DNA profiles of both Lopez and appellant. India Henry, a forensic analyst at the Houston Forensic Science Center, analyzed the swabs and concluded that each of the swabs contained "[a] mixture of DNA from at least three contributors, at least one of whom is male," but the "DNA mixture is not suitable for comparison due to an excessive number of contributors." Appellant was excluded as a possible contributor to the DNA mixture found on swabs of Lopez's forearms, knuckles, and palms.

with a man. Williamson believed appellant was describing Lopez. Appellant stated that he had intended to catch the westbound bus on Cavalcade to go to a restaurant, and he walked to the bus stop at Cavalcade and Fulton to wait for the bus. Williamson testified that this statement was not supported by the surveillance footage, which did not show appellant walking to the bus stop on the north side of Cavalcade. Williamson asked appellant if he had a confrontation with Elizondo at Dairy Land, and appellant said no. When Williamson mentioned that there was surveillance footage showing the confrontation, appellant talked instead about being followed by someone in a pickup truck and punching the driver of that truck. Appellant did not know which day that particular encounter occurred.

Appellant referred to Lopez and stated that Lopez "kept walking in front of him" but was also "following" him from the light rail platform. Williamson testified that this was not supported by the surveillance footage, which showed appellant and Lopez appearing to walk somewhere together. Appellant stated that while Lopez kept walking down Cavalcade, he returned to the light rail platform. Later in the interview, appellant denied getting into a confrontation at the Dairy Land, but he then admitted having an interaction with someone who had pulled up to the parking lot in a car. Appellant believed that this person then followed him on Fulton in his car while he ran down the street to catch the light rail at a different stop than the one located at Cavalcade.

16

The jury found appellant guilty of murder and assessed his punishment at confinement for twenty-five years.

## Sufficiency of the Evidence

In his sole issue, appellant argues that the State failed to present sufficient evidence that he caused Lopez's death. He argues that while there was evidence in the record that he was in the area at the time of Lopez's murder, there is insufficient evidence that he was the person who committed the murder.

### A.     *Standard of Review*

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). The jurors are the exclusive judges of the facts and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008); *see Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011) (stating that role of factfinder is "as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence").

The jury, as the sole judge of credibility, may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *Rivera v. State*, 507 S.W.3d 844, 853 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd); *see*

*Bohannan v. State*, 546 S.W.3d 166, 178 (Tex. Crim. App. 2017) (stating that factfinder has duty to resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts).

We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *Bohannan*, 546 S.W.3d at 178; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *see also Nisbett*, 552 S.W.3d at 262 ("A court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally."). We resolve any inconsistences in the evidence in favor of the verdict. *Bohannan*, 546 S.W.3d at 178; *see also Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination.").

A criminal conviction may be based on circumstantial evidence. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012); *see Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) ("It is not necessary that the evidence directly proves the defendant's guilt . . . ."). "A lack of direct evidence is not dispositive of the issue of guilt." *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Nisbett*, 552 S.W.3d at 262. "Each fact need not point directly and

independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We must consider the evidence cumulatively and may not "use a 'divide and conquer' strategy for evaluating the sufficiency of the evidence." *Nisbett*, 552 S.W.3d at 262 (quoting *Murray*, 457 S.W.3d at 448).

### B. Murder

Appellant contends that the State did not present sufficient evidence that he caused Lopez's death. He argues that there is no video footage of him shooting anyone, the police did not recover a firearm, his DNA was not found on Lopez or at the scene, and no one witnessed him with Lopez in the alley where the shooting occurred. He argues that, although he admitted he had been at the light rail platform on the night of the shooting and conversed with Lopez, his mere presence near the scene of the shooting and the suspicion that he committed the murder is not enough to sustain his conviction.

To prove that appellant committed the offense of murder, the State had to establish that appellant intentionally or knowingly caused the death of Lopez by shooting him with a deadly weapon, a firearm.[6] *See* TEX. PENAL CODE ANN.

---

[6] The grand jury charged appellant with the offense of capital murder. In the jury charge, the trial court instructed the jury on capital murder and also submitted the lesser-included offense of murder. The lesser-included offense instruction enabled

19

§ 19.02(b)(1). Identification of the defendant as the person who committed the charged offense is part of the State's burden of proof beyond a reasonable doubt. *Wiggins v. State*, 255 S.W.3d 766, 771 (Tex. App.—Texarkana 2008, no pet.); *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd) ("There is no question that the State is required to prove beyond a reasonable doubt that the accused is the person who committed the crime charged."). The State may prove a defendant's identity as the perpetrator of an offense by direct or circumstantial evidence or by reasonable inferences from the evidence. *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018); *Jenkins*, 493 S.W.3d at 599 ("The State may prove a defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence."). A direct in-court identification of the defendant as the perpetrator is the preferred procedure, but that type of identification is not required. *Wiggins*, 255 S.W.3d at 771; *Greene v. State*, 124 S.W.3d 789, 792 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (stating, in context of analyzing ineffective assistance of counsel complaint, that identity can be proved by direct or circumstantial evidence and "eyewitness identification is not necessary").

---

the jury to find appellant guilty of murder if it found, beyond a reasonable doubt, that appellant intentionally or knowingly caused the death of Lopez by shooting him with a deadly weapon. *See* TEX. PENAL CODE ANN. § 19.02(b)(1).

20

Here, although no eyewitness saw appellant shoot Lopez, appellant's DNA was not found on Lopez, and police never recovered the gun used in the shooting, we conclude that the circumstantial evidence presented by the State established appellant's identity as the person who shot Lopez. *See Delacerda v. State*, 425 S.W.3d 367, 382 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (stating, in context of determining whether State's question during voir dire constituted improper commitment question, that "[s]ufficient evidence can support a murder conviction even in the absence of physical evidence such as DNA evidence, fingerprinting evidence, and the murder weapon" and that this evidence "is not required to obtain a conviction"). Contrary to appellant's argument on appeal, the State presented evidence beyond appellant's mere presence in the area at the time of the shooting and the fact that he conversed with Lopez.

Surveillance footage demonstrated that appellant arrived at the light rail stop at Fulton and Cavalcade just after 9:30 p.m. on February 28, 2018. Appellant acknowledged that the man depicted in the surveillance footage is him. Surveillance footage also showed that appellant spoke with Lopez while both were sitting on a bench at the rail platform. Appellant does not deny speaking with Lopez. Detective Williamson testified that surveillance footage from another location earlier in the evening had depicted Lopez interacting with others and appearing to ask for money or cigarettes. Although the footage from the light rail platform did not have audio, it

21

appeared from Lopez's and appellant's gestures that they were having a similar conversation. According to Williamson, appellant rubbed his fingers together, a gesture that typically indicates money and seeking payment for something.

Surveillance footage from both the light rail platform and the Dairy Land at the intersection of Fulton and Cavalcade showed Lopez and appellant walking together from the platform and heading east on Cavalcade around 9:35 p.m. Williamson testified that appellant walked faster than Lopez and at some points, he would pause and wait for Lopez to catch up, indicating that they were walking together. They disappeared from the view of all cameras around 9:37 p.m., while still walking east on Cavalcade towards the alley in between the houses on McEwen and Siegel. The footage did not show anyone else walking past McEwen on Cavalcade.

Around this time, Medrano heard multiple gunshots coming from the alley behind her house. Elizondo, who was outside in the driveway of his house, also heard multiple gunshots coming from the alley. Parrish, who was waiting at the bus stop at Fulton and Cavalcade, also heard multiple gunshots, and while he did not know where the shots were coming from, he testified that it sounded like they were coming from "close by."

Medrano looked out of a window facing the alley and saw a man wearing dark pants and a hooded sweatshirt—clothing that matched what appellant was wearing

22

that evening—standing still and bending down. Medrano was not able to see this man's face or identify this man, and she did not see anyone else with him. This man then ran out of the alley. Elizondo, upon hearing the gunshots, ran towards his backyard. He testified that he saw fire from a gun discharging and a man leaving the alley and walking towards Cavalcade. Elizondo described the man's clothing and hairstyle—a black hooded sweatshirt, black pants, black shoes, and short dreadlocks with beads—and he identified this man in court as appellant. Parrish also saw a man, whom he could not identify, standing at the opening of the alley. He saw this man walk towards Dairy Land.

After the man ran out of the alley, Medrano moved to the front of her house and immediately saw the same man she had seen in the alley running in front of Dairy Land. Likewise, Elizondo testified that he got in his car, drove to Cavalcade, and, seconds later, saw appellant walking west on Cavalcade towards Dairy Land. This testimony was supported by the Dairy Land's surveillance footage. This footage showed appellant reappearing on camera, alone, around 9:38 p.m. and walking west on Cavalcade towards Dairy Land. Almost immediately thereafter, Elizondo's car— a gray Chevrolet Impala—appeared on camera. On her first 911 call, Medrano reported seeing a silver Impala immediately after the shooting. About ninety seconds passed between the time appellant and Lopez, walking east together on Cavalcade, disappeared from the view of the Dairy Land camera and the time appellant, walking

23

west on Cavalcade by himself, reappeared on the surveillance footage. Lopez was later discovered lying face-down in the alley with multiple gunshot wounds.

The State thus presented evidence that appellant, who acknowledged speaking and walking with Lopez just before the shooting, was the last person to see Lopez alive. *See Ingerson*, 559 S.W.3d at 510 (considering, in determining whether evidence was sufficient to prove identity, that defendant had opportunity and means to kill complainants because he was last person to see them alive); *Orellana v. State*, 381 S.W.3d 645, 653 (Tex. App.—San Antonio 2012, pet. ref'd) (considering evidence that defendant and complainant had altercation shortly before murder and evidence that defendant was alone with complainant and was last person known to be with complainant before murder). Both Medrano and Elizondo testified that they saw a person in the alley immediately after the gunshots that killed Lopez, and they testified that they saw this person again at Dairy Land. Medrano, Elizondo, and Parrish all saw one man leave the alley after the shooting. Elizondo identified appellant in court as the person he saw in the alley. There is no evidence in the record that anyone else was in the alley at the time of the shooting.[7]

---

[7] Appellant points to Medrano's testimony that residents in that area used the alley to enter their homes through their backyards, and he argues that "the record evidence demonstrates that someone other than Appellant, could have shot the deceased in that alleyway." The beyond a reasonable doubt standard, however, "does not require the State to disprove every conceivable alternative to a defendant's guilt." *Ramsey v. State*, 473 S.W.3d 805, 808 (Tex. Crim. App. 2015). The State presented evidence that appellant and Lopez appeared on surveillance footage walking together towards

At trial, Medrano testified that she saw the man from the alley and the driver of the Impala have some kind of interaction by the Dairy Land. Elizondo testified that he rolled his window down and asked appellant if he was the person who fired the gunshots near Elizondo's house. Elizondo could not hear what appellant said in response, and appellant walked towards the light rail platform. Parrish heard the man in the car—Elizondo—yell something about a shooting, and he saw the man on foot—appellant—run towards the light rail platform. The Dairy Land's surveillance footage supported Elizondo's, Medrano's, and Parrish's testimony. The footage depicted Elizondo's car turning onto McEwen and slowing down. Appellant, on foot, turned around and took a few steps towards the car. Elizondo then drove out of the camera frame, and appellant continued walking to the light rail platform.

Elizondo testified that he had a confrontation with appellant in the Dairy Land parking lot within minutes of the shooting. Elizondo pulled his car into the parking lot and got out. He accused appellant of shooting at his house, and appellant responded by immediately taking a gun out of his waistband. Elizondo testified that appellant said, "I'll shoot you, too," and started running towards him. Elizondo retreated towards the doors of the Dairy Land, which was closed at the time.

---

the alley, witnesses heard gunshots coming from the alley, less than two minutes later appellant appeared on surveillance footage by himself walking away from the alley, and Lopez was found lying face-down in the alley with five gunshot wounds. There is no indication in the record that a third person was in the alley at the same time. The State was not required to prove otherwise.

Appellant pointed the gun at Elizondo, but either the gun jammed or appellant had run out of ammunition. While Elizondo was near the Dairy Land doors, appellant walked to Elizondo's car and said, "I'm going to take your car now." Appellant did not steal Elizondo's car but instead ran west across Fulton on foot and fled the scene. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) ("We have recognized that a factfinder may draw an inference of guilt from the circumstance of flight."); *see also Ingerson*, 559 S.W.3d at 510 (stating that having opportunity to murder someone and then fleeing crime scene is circumstance of guilt). Elizondo tried to follow appellant through the neighborhood, but he could not catch up to appellant.

Parrish also witnessed this confrontation, and his testimony largely corroborated Elizondo's. Although Parrish did not identify either man by name, he heard Elizondo say to appellant, "I saw what you just did." He saw appellant pull a gun from his waistband, point it at Elizondo, and say, "I'll kill you." He saw appellant attempt to shoot Elizondo, but the gun malfunctioned. Parrish then witnessed appellant run towards the light rail stop and then towards the convenience store at the northwest corner of Fulton and Cavalcade. He saw Elizondo trying to follow appellant in his car. The jury was entitled to believe Elizondo's and Parrish's testimony, and we defer to that credibility determination. *See Adames*, 353 S.W.3d at 860; *Rivera*, 507 S.W.3d at 853; *see also Bohannan*, 546 S.W.3d at 178 (stating

26

that we may not re-evaluate weight and credibility of evidence or substitute our judgment for that of factfinder).

The surveillance footage from the Dairy Land and the light rail platform also depicted this confrontation. Although no audio was available on the recording, appellant and Elizondo could be seen gesturing and yelling at each other. The footage showed appellant leave the rail platform and run back towards Dairy Land. The footage showed appellant point something at Elizondo, although it was not clear what was in his hand. The footage further showed Elizondo near the doors of the Dairy Land, appellant near Elizondo's car, appellant running west across Fulton and then back east across Fulton on the other side of the intersection, and Elizondo trying to follow appellant in his car.

This footage, although lacking in audio, supports Elizondo's and Parrish's testimony. The footage does not support the version of events appellant told Williamson in his interview, namely, that he walked to the bus stop on Cavalcade; Lopez continued walking towards the alley alone; and appellant did not have a confrontation with anyone at Dairy Land. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (stating that inconsistent statements and "implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt"); *Harmel v. State*, 597 S.W.3d 943, 954–55 (Tex. App.—

27

Austin 2020, no pet.) (noting, in sufficiency of evidence analysis, that surveillance footage undermined defendant's explanation for meeting with complainant).

Considering all the evidence, and reasonable inferences from that evidence, in the light most favorable to the jury's verdict, we conclude that a reasonable factfinder could find beyond a reasonable doubt that appellant caused Lopez's death by shooting him with a firearm. *See Nisbett v. State*, 552 S.W.3d at 262; *see also Jenkins*, 493 S.W.3d at 599 ("The State may prove a defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence."). We hold that the State presented sufficient evidence to support appellant's conviction.

We overrule appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.


April Farris
Justice

Panel consists of Justices Hightower, Countiss, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).